# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### NORTHERN DIVISION

Case No.: 3:21-cv-988
L.T. No.:  2013-CF-758 D

**ANTHONY LAMAR WILSON, JR.**
                    Petitioner,

vs.

**MARK S. INCH**, Secretary,
Department of Corrections, State of Florida,

                    Respondent.
_____/

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY UNDER 28 USC § 2254 AND SUPPORTING MEMORANDUM OF LAW

Prisoner's Name:          Anthony Lamar Wilson
Prisoner's DC No.:        P19379
Place of Confinement:     Graceville Correctional Facility,
                          Jackson County Florida

Submitted by:
SUSANNE K. SICHTA, ESQ.
Fla. Bar. No. 59108
RICK A. SICHTA, ESQ.
Fla. Bar No. 669903
301 W. Bay St. Ste. 14124
Jacksonville, FL 32202
(904) 329-7246
susanne@sichtalaw.com
rick@sichtalaw.com
Attorneys for Petitioner **Wilson**

## INTRODUCTION

This petition is timely filed pursuant to 28 U.S.C. § 2254. Petitioner, ANTHONY WILSON, is currently confined by the State of Florida at Graceville Correctional Facility, in Graceville, Florida. Mr. Wilson was born on May 24, 1984; his Department of Corrections identification number is P19379. The judgment of conviction and sentence at issue arises out of the First Judicial Circuit, in and for Escambia County, Florida.

## RECORD REFERENCES

Citations to the Record on Appeal for Mr. Wilson's direct appeal, First DCA Case No. 1D14-5422 will be by "R" followed by the page number. Citations to the trial transcripts within the Record will be referenced by "T" followed by the page number. Citations to the Record on Appeal for Mr. White's 3.850 appeal, First DCA Case No. 1D20-2352 will be by "PCR" followed by the page number.

## STANDARD OF REVIEW

An applicant in custody pursuant to a state court judgment is entitled to habeas corpus relief upon a federal constitutional claim if an adjudication on the merits in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision

that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. Section 2254(d).

"The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the relevant Supreme Court precedent." Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002) (quoting Fugate v. Head, 261 F.3d 1206, 1216 (11th Cir. 2001), cert. denied, 535 U.S. 1104, 122 S. Ct. 2310, 152 L. Ed. 2d 1065 (2002) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)). An "unreasonable application" occurs when the state court identifies the correct governing legal principle from the Supreme Court decision but unreasonably applies that principle to the facts of the prisoner's case. See Lockyer v. Andreade, 538 U.S. 63 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)). Mere error will not suffice; the erroneous ruling must have been "objectively unreasonable." See Wiggins v. Smith, 539 U.S. 510, 520-21 (2003). An "objectively unreasonable" decision requires some incremental degree of incorrectness beyond simple error. See, e.g., Gerstein v. Senkowski, 426 F.3d 588, 607 (2d Cir. 2005).

"Federal habeas courts generally defer to the factual findings of state courts, presuming the facts to be correct unless they are rebutted by clear and convincing evidence." Jones v. Walker, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (en banc). However, "[w]hen a state court's adjudication of a habeas claim results in a decision

that is based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." Id. (quotations marks, citations, and alterations omitted).  In other words, "[w]hen a state court unreasonably determines the facts relevant to a claim, 'we do not owe the state court's findings deference under AEDPA,' and we 'apply the pre-AEDPA *de novo* standard of review' to the habeas claim." Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328, 1353 (11th Cir. 2011) (quoting Jones, 540 F.3d at 1288).

## PROCEDURAL HISTORY AND TIMELINESS OF THE INSTANT PETITION

Mr. Wilson was indicted with Counts: 1) first degree felony murder with kidnapping and/or robbery as the underlying offense; 2) armed burglary; 3) false imprisonment; 4-7) false imprisonment of a child; and 8) grand theft auto.  The state nolle prossed all but counts 1 and 2.  (1 R 1, 3.)

Mr. Wilson was tried jointly his cousin, co-defendant Deontrez Kitt.  A jury was selected and trial began on November 3, 2014.  (23 R 30.)  The jury returned a verdict of guilty as charged to Count 1.  As to Count 2, the jury found that Mr. Wilson was guilty of armed burglary, but that Mr. Wilson did not actually possess a firearm.  (17 R 2106.)  Mr. Wilson received a mandatory life sentence for Count 1, and life for Count 2, concurrent with Count 1.  (17 R 2112-14.)

Mr. Wilson timely appealed his judgment and sentence.  (17 R 2120.)  He

raised two issues on direct appeal:  1) the trial court abused its discretion in allowing evidence of alibi to be presented and argued by the state when it was not presented in any way by the appellant, shifting the burden of proof; 2) the trial court erred in responding to a jury question in a way that improperly emphasized the principals jury instructions, thereby dictating the verdict.  The First District Court of Appeal (DCA) per curiam affirmed (PCA) Mr. Wilson's case on October 14, 2016.  <u>Wilson v. State</u>, 202 So. 3d 414 (Fla. 1st DCA 2016.)  Petitioner Wilson did not file a petition for writ of certiorari with the United States Supreme Court.

Mr. Wilson filed a 3.850 motion for postconviction relief on January 12, 2018. (PCR 35-68.)  The postconviction court issued a <u>Spera</u> order on June 20, 2018,[1] allowing 60 days to file an amended 3.850.  (PCR 115-21.)  On August 19, 2018, an amended 3.850 motion was filed raising the same five issues that were in his original 3.850 motion:  1) Newly discovered evidence (NDE) that Trevon Nelson, a testifying co-defendant, recanted his trial testimony that implicated Mr. Wilson and the evidence will probably produce an acquittal on retrial; 2) defense counsel was ineffective in failing to request severance of Mr. Wilson's trial from Deontrez Kitt's trial; 3) counsel was ineffective in failing to file a motion in limine to exclude the entire recorded interrogation that was more prejudicial than probative where Mr.

---

[1] <u>Spera v. State,</u> 971 So. 2d 754 (Fla. 2007).

Wilson made no admissions but the officer repeatedly stated that Mr. Wilson was guilty; 4) counsel was ineffective in failing to present testimony of Stacey Gulley, LB, HH, Mike Gadson, and Shonda McDonald; 5) and cumulative error. (PCR 122-165.)  Mr. Wilson filed a notarized affidavit signed by Trevon Nelson with the court on October 25, 2018. (PCR 212-14.)  The postconviction court ordered the State to respond. (PCR 215-16.)  The State responded on March 21, 2019. (PCR 219-237.)  Mr. Wilson filed a motion for leave to file a reply with attached reply on April 9, 2019. (PCR 621-30.)  The postconviction court issued an order granting an evidentiary hearing on all of Mr. Wilson's 3.850 claims. (PCR 631-32.)  A bifurcated evidentiary hearing was held on December 17, 2019 and January 7, 2020. Mr. Wilson filed a written closing argument on April 28, 2020. (PCR 1802-1866.) The State filed a written closing argument on July 7, 2020. (PCR 1871-88.)  The court denied relief 10 days later on July 17, 2020. (PCR 1889-2057.)

Mr. Wilson timely appealed the order denying postconviction relief.  The First DCA PCA'd Mr. Wilson's 3.850 appeal on August 6, 2021.  Mandate issued on August 27, 2021.

This timely petition for writ of habeas corpus follows.

## FACTUAL SUMMARY

**Summary of the Evidence Presented at Trial.**

On December 23, 2012, Deontrez Kitt, Deavis Saulsberry, and Trevon Nelson hatched a plan to rob known-drug dealer, Torrance Hackworth. (T 665-666, 732-35.) Mr. Wilson was not present for this plan. The state's key witness, co-defendant Nelson, claimed that after the plan was made, Kitt and Saulsberry dropped him off at Petitioner Anthony Wilson's house, which was across from Mr. Hackworth's apartment. There, Mr. Nelson allegedly convinced Mr. Wilson to participate in the robbery. (T 737; PCR 722-23, 724-25.)

In the early morning hours of December 24, 2012, several individuals forcibly entered Torrance Hackworth's J Street, Pensacola, apartment with firearms. (T 305.) Monica Watkins, Mr. Hackworth's fiancé, was present, and testified that the individuals demanded money and drugs, beat up Mr. Hackworth, forced him into the trunk of her white Buick, and drove away. (T 1343.) Ms. Watkins eventually called 911 from a neighbor's apartment. She informed law enforcement that there were four to five suspects and they were all wearing masks. She later said they were not all wearing masks. (T 1400.) Watkins testified that during the incident, she was not wearing her glasses, which help her see, that it was dark in the apartment, and only their Christmas lights were on. Watkins said that an assailant who had dreadlocks (who she would claim, many months later, was Wilson) had short "twig" dreadlocks,

dark-skin, and was 5' 6" or 5' 7" tall. At the time Mr. Wilson had long dreadlocks, he is not dark skinned, and is 5'11". (R 4-6 –arrest report; T 1390-93.)

Ten minutes before Watkins called 911, police received a 911 call concerning a man jumping from a white car (Watkins' Buick) near S and Blount Streets, and running, then gunshots were fired. (T 1342.) Sometime later, there was another 911 call reporting that a car (the Buick), was partially submerged at the Sanders Beach boat ramp. Mr. Hackworth's body was recovered in the area of S and Blount on December 26. (T 1315 et seq.)

Trevon Nelson, Deavis Saulsberry, and Deontrez Kitt were arrested for the crimes. Petitioner Wilson was arrested months later - the prosecutor conceded in postconviction there was less evidence against Mr. Wilson than any of his co-defendants. (PCR 1654.)

Testimony from cooperating co-defendant Mr. Nelson, and a photo identification by Ms. Watkins, was the state's primary evidence against Mr. Wilson at his trial. (PCR 271). Yet, prior to putting Nelson on the stand as a state witness, the state was aware Nelson repeatedly lied to police, and that there were "certainly differences" in the specifics of Nelson's testimony between Saulsberry and Kitt/Wilson's trials. (PCR 1608-09, 1646.) Also, despite that Ms. Watkins' description of the assailant with dreadlocks did not match Mr. Wilson, she picked him out of a photo line-up four months after the incident. (PCR 1699.) The state

also presented cell phone data it claimed put Mr. Wilson in the vicinity of Hackworth's apartment around the time the robbery occurred. (T 1365.) However, the defense's cell phone expert testified that Hackworth's home was outside the area of the cell tower in question. (T 1186.) The defense further showed that even if the state's expert was correct, the information was not incriminating because Hackworth's apartment was across the street from the woman's house where Mr. Nelson testified he met Wilson that night. (T 737.)

Mr. Wilson's attorney, Patrece Cashwell, argued at trial that her client was innocent and that it was a case of mistaken identity. (e.g. TT 1378, 1398-99.) Ms. Cashwell testified during the postconviction evidentiary hearing that she continues to adamantly believe that Mr. Wilson is innocent. (PCR 1733.) She believed that Mr. Nelson was lying at the time of trial but could not prove it at the time. (PCR 1714, 1733.) Ms. Cashwell explained to the jury that Mr. Wilson was not present at Deontrez Kitt's trailer when the plan to rob Mr. Hackworth was hatched. (e.g. T 1329, 1359.) She presented a cell phone expert who testified that a call to Mr. Wilson's phone at 2:40 a.m. hit a tower that excluded the burglary and shooting locations; and there was no cell phone evidence closest to where the shooting occurred. (T 1186, 1397.) Further, she argued there was a call between Nelson and Wilson that went to voicemail immediately before the burglary, indicating that Wilson would not have been with Nelson perpetrating the instant crimes. (T 1398.)

The state presented significantly more evidence against Mr. Kitt than Mr. Wilson. In addition to Trevon Nelson's testimony that Kitt was involved, and a photo identification of Kitt by Ms. Watkins, the state presented testimony from Mr. Kitt's neighbor, Michael Vaughn, implicating Mr. Kitt. Vaughn testified that Kitt, Saulsberry, and Nelson, but not Petitioner Wilson, were together at Kitt's house right before the crimes (T 665-666); Mr. Kitt asked to borrow Vaughn's van to "hit a lick" the day before the crimes, but Mr. Vaughn declined. (T 666.) Mr. Vaughn testified Mr. Kitt gave him some dark stained clothes to hold on to the day after the crimes. (T 668-69.) Vaughn testified that the day after the crimes, Kitt was shaken up, had shaved off his facial hair, and told Vaughn that he did something the previous night that was going to ruin his life. (T 667.) Vaughn also testified that Mr. Kitt's girlfriend owned a Black Monte Carlo with a red pinstripe, (T 1327-28) like the one identified as being driven by the suspects. The state also introduced cell phone evidence putting Kitt in the vicinity of Mr. Hackworth's home, the location where Mr. Hackworth's body was found, the location of the sunken car, and back to Mr. Kitt's house. (T 1354, 1365-66, 1445.) Kitt's cell location records matched Saulsberry and Nelson's, indicating that the men were together. (T 1367.) An FDLE examiner

testified that Mr. Kitt was a major contributor to DNA on a black glove found near the shooting location. (T 1352.)[2]

Ms. Cashwell's closing argument asked the jury not to convict Wilson through "guilt by association" with his cousin, Mr. Kitt.  (T 1374-75, 1378-79.)

In jury deliberations, the jury asked whether Mr. Wilson could be convicted of the homicide if he only intended to participate in the burglary.  (R 2105.)  The jury found Mr. Kitt guilty as charged of felony murder and armed burglary, but determined by special verdict form that he did not actually possess a firearm.

### Evidence presented in the Postconviction Proceedings.

**Trevon Nelson's recantation**: Mr. Nelson testified in postconviction that Mr. Wilson was wrongfully convicted and is innocent of any wrongdoing in this case. Mr. Nelson confessed that his testimony at Mr. Wilson's trial was false, explaining that Mr. Wilson was not present for the home invasion, kidnapping, or shooting of Mr. Hackworth. (PCR 1444.) Mr. Nelson testified that he went to see Mr. Wilson at a woman's house across from Mr. Hackworth's on the night of the events, and asked Mr. Wilson to participate in this crime, but Mr. Wilson said no.  Wilson said he did not "want nothing to do with that…I'm trying to enjoy my Christmas with my kids."

---

[2] The FDLE analyst testified that Mr. Wilson may have been a contributor to the mixed DNA from the glove.  However, the state argued Mr. Kitt was wearing the glove during the crimes.  (T 1353.)

Mr. Wilson was "an inspiring rapper at the time" and did not rob people. (PCR 1445.)

Mr. Nelson falsely implicated Mr. Wilson primarily because the police told him he would never see his family again if he did not "tell us something, and I just started filling in the blanks." Mr. Nelson asked the police see his mother, Elease Robbins, and was told "[n]o. You're never going to see her again if you don't tell us something." "Whatever questions [the detective] was asking, I was just – I was just filling in the blanks for people that I just knew – do you know what I mean – to fit the description." (PCR 1451-52.) Nelson stated:

> Mr. Wilson – when he [the police asked about] somebody with dreads or whatever, Mr. Wilson was the first one who came to my mind, you know. That's why Mr. Wilson came up in this unfortunate and devasting incident. He was just a fill-in, you know. He didn't deserve what I did to him, you know. I should have took responsibility for my actions and didn't assist the State in their witch hunt for just getting a high profile case solved.

(PCR 1452.) Nelson would have done "absolutely" anything for his mother, and was concerned the police were going to go after her if he did not cooperate fully with the Hackworth murder investigation. (PCR 1452-54.)

Evidence corroborated Mr. Nelson's recantation: following Mr. Nelson's arrest, the police did arrest his mother, Elise Robbins, for "tampering with a witness." Nelson explained that the police threatened that "unless I keep participating, that my mother was going to get a long time in prison, and they charged

her with a crime." (PCR 1454.) The record also indicates that the charges against Mr. Nelson's mother were dropped around the time Nelson conclusively decided to assist the state.[3] Nelson indicated that the prosecutor dropped the charges against his mother because he "started cooperating." (PCR 1454.) Nelson believed he had to cooperate with the state, so he implicated Wilson, an innocent person. (PCR 1455.) Mr. Nelson's decision was also influenced by his mother's mental and physical health following her arrest. (PCR 1456.)

Prior to cooperating with the police, Mr. Nelson had tried to back out "numerous times…" The first occasion was during his initial interview with the Pensacola Police Department, the second was when he was transferred to Santa Rosa, and the third was "prior to me testifying against Mr. Wilson." Mr. Nelson told the state "I was good…I'm not going to assist in getting an innocent man convicted…and then he brought up the situation with my mother again, with her being charged and not being charged…[so] I reluctantly went along with it." (PCR 1454-55.) Nelson explained that his reluctance to testify against Mr. Wilson is clear from his trial testimony:

> If you can pay attention to my trial testimony, you can see that in my expression and my actions. Numerous times they were asking me questions, Mr. Gaddy [the prosecutor], and I was reluctant to answer

---

[3] Evidence was introduced at the evidentiary hearing establishing that Ms. Robbins was arrested and that her charges were dropped on April 8, 2014, six days after a meeting between Nelson and the state, and six weeks prior to his plea. (PCR 1206; 1727-28.)

those questions.

(PCR 1455.)

Mr. Nelson also cooperated with the state because he and his family were being threatened by the victim's associates. Mr. Nelson explained that Mr. Hackworth, the deceased in this case, was a gang member. He was a member of the "'A' Street Mafia" and Mr. Nelson was put in a cell "with known affiliates of Mr. Hackworth" following his arrest. (PCR 1457.) Nelson was "under tremendous pressure" and "was being assaulted on a numerous [sic] basis" at the county jail by Mr. Hackworth's friends:

> I was being jumped on repeatedly. My food was being taken. I was receiving threats by the victim's affiliates on the street about protecting my loved ones, about setting my mother's house on fire, and I was taking medication at the time.
>
> Due to that, due to me growing up inside the Lakeview Center, in and out being a mental patient – and my mother was coming up. She was crying repeatedly, and I just had to think of something just to take the pressure off. He was the first person in – he was the first person that came to my head because I just seen him like an hour, a couple of hours before. He was inside the studio rapping.

(PCR 1451.)

Mr. Nelson testified that his chronic and severe mental illness was also a contributing factor in his decision to falsely implicate Mr. Wilson. Mr. Nelson suffers from bipolar disorder, "severe depression," and has had mental disorders since he was four or five years old. He has been hospitalized because of these

disorders. He was institutionalized at Lakeview Center for his "whole childhood, adolescence," and was at the Crisis Stabilization Unit during his "[y]ounger teenage years." (PCR 1457-58.) Mr. Nelson was treated for his "severe mental disorders," in an attempt "to facilitate being a productive member of society." He had been prescribed "Zoloft, Seroquel, Ritalin, Adderall and a couple of more" that he could not recall. (PCR 1458.) He had also been Baker Acted twice. Nelson explained these mental illnesses make him more susceptible to pressure and coercion. (PCR 1459.)

Because Mr. Nelson knew Mr. Wilson, and because Mr. Nelson participated in the instant crimes, it was easy for him to insert Mr. Wilson into the story as the dreadlocked perpetrator. (PCR 1461.) Law enforcement also gave Nelson "descriptions, heights, detail of the crime scene…basically a review of what happened.." (PCR 1453.)

The prosecutor met with Mr. Nelson prior to his depositions and trial testimony. (PCR 1461.) Nelson was shown "descriptions of the person who did it," and an "outline, as far as the crime scene." When Nelson initially told the prosecutor what happened, the prosecutor told him that's "not what happened. This is what happened." (PCR 1461-62.) Nelson was told about Mr. Wilson's involvement, Mr. Kitt's involvement, and Mr. Saulsberry's involvement, because the prosecutor wanted "everything to correlate, and he wanted everything to fit in, I guess, into his questions or whatever he had lined up…" (PCR 1462.)  "At that time I told him,

Man, don't worry about it man.  I don't want to testify, man.  I'm good; but then he brought up my mother again.  My mother was a frequent occurrence inside this case.  It was always my mother, my mother.  She was charged; and then when I started coopering, the charges was dropped."  (PCR 1462-63.)

Mr. Nelson explained why he came forward with the truth now:

Why come forward now? I mean, it's because I'm living a different life now. At one point in time – at one point in time I didn't care about nobody, you know. I'm not saying I'm an innocent man. I'm most definitely guilty, you know of my crimes. You know, I'm most definitely guilty; but just to see an innocent man go down because I didn't care about myself – you know, I didn't care about nobody else. The only thing I cared about was my mother.

* * *

Seeing an innocent man convicted and sentenced to life from my shortcomings and my downfalls in life, I feel that is a travesty to not only myself but the judicial system that America was built on…

* * *

Unfortunately, so, that's what happened inside Mr. Wilson's case. I was pressured. I was beat up. My mother was charged. My family was threatened. The federal agent was threatening to indict everybody I loved, everybody that I growed [sic] up with, close affiliates, close friends, and, I mean, I filled in the blanks by getting Mr. Wilson convicted of something he had nothing to do with. I can honestly say that this man – he's innocent. So I've got to – it's not about why I come forward now, you know. It's the part – it's about freeing an innocent man.

(PCR 1465-66.)

**Elease Robbins,** Mr. Nelson's mother, confirmed Mr. Nelson's postconviction testimony that she was arrested on September 13, 2013. Although she was arrested for a misdemeanor offense, there were "so many" police officers at her house -

around "[t]wenty to twenty-five" in approximately "twelve or thirteen cars." (PCR 1507-08, 1634.)   Law enforcement was armed and told her they had an arrest warrant. (PCR 1529.) She was scared and could not understand "why they were looking for me" because she had not done anything wrong. Ms. Robbins also received threats from people "telling me what they was going to do to my family and me." (PCR 1531.)   Criminal charges were filed against her on October 4, 2013, Escambia County case number 2013-MM-006163.  The charges were pending for nearly eight months before they were dropped on April 8, 2014. (PCR 1541.)  She has "been hurting for years" over this traumatic experience. (PCR 1528, 1543.)

Ms. Robbins also confirmed Nelson's mental health testimony, explaining that her son saw "[p]lenty" of doctors, and that his school had recommended mental health treatment. (PCR 1534.)

**Monica Watkins,** the state's other primary against Wilson at trial, testified during the postconviction hearing.  She admitted to being convicted of at least two prior felonies. (PCR 1547-48.) Immediately following Mr. Hackworth's kidnapping and before anyone was arrested for it, she met with Mr. Hackworth's relatives to discuss "how many people was in there and what all happened." (PCR 1546.) She discussed the incidents with "[e]veryone," including Mr. Hackworth's "mother, his grandmother, his sister, his brother, cousin, my mother." (PCR 1548.)

Ms. Watkins admitted in her postconviction testimony, first the first time in

the case, that she was shown a photo of a person with dreadlocks by the victim's wife (PCR 1552), and Ms. Watkins sent a photo of Deontrez Kitt to her friend Stacey Gulley, asking whether Ms. Gulley knew him, prior to her formal photo identification of Mr. Kitt and Mr. Wilson with the police. (PCR 1551.) Watkins conceded that "a lot of people was identifying" Mr. Kitt as a suspect. (PCR 1552.) In fact, "not even thirty minutes" after the robbery, and before she made any police identifications, she was shown a picture of Mr. Kitt by Rachel Hackworth, asking whether he was one of the individuals involved in the crime. (PCR 1552, 1560.)

During the postconviction hearing, Ms. Watkins testified, contrary to her trial testimony, that she never told police that all of the suspects were wearing masks. (PCR 1547; TT 234-35, 240, 344.)  She also claimed in postconviction that her deposition testimony concerning her initial statement to police, that all the suspects were wearing masks, was incorrect. (PCR 1547.)  She claimed, again contrary to her trial testimony, that there were lights on in the apartment at the time of the crimes other than Christmas lights.[4] (PCR 1550; TT 362, 1382.)

---

[4] At trial evidence was presented that Watkins is a convicted felon who sold drugs out of her home. (T 1379.) She needs glasses to see well but was not wearing her glasses that night. (T 425.) She only she saw a general outline of the perpetrators. (T 426.) She originally said that all of the suspects were wearing masks during the events, but she later said that two or three were not wearing masks (T 1400); she initially stated that the dreadlocked assailant had short "twig" dreadlocks, he was dark-skinned, and he was between 5'6" and 5'7." However, Mr. Wilson had long dreadlocks down his back at the time, he is not dark skinned, and stands nearly 6' tall; Watkins also conceded at trial that the house was only lighted by Christmas

**Stacey Gulley** testified in postconviction that she was willing and available to testify at Mr. Wilson's trial but was never contacted by the defense. (PCR 1575-76.) She and Monica Watkins are longtime friends. According to Ms. Gulley's observations, Ms. Watkins had no idea who the perpetrators were in this case. Shortly after the incident, Ms. Gulley went to Mr. Hackworth's grandmother's house and saw a "whole bunch of people" there, including Ms. Watkins. (PCR 1566-70.) Ms. Gulley played "detective" by repeatedly asking Ms. Watkins about possible suspects:

> Gulley: I asked her. Were they tall? Were they short? Were they fat? Did they have dreads? Did they have gold in their mouth? What kind of shoes were they wearing? What were their skin color, anything, and she said, I don't know why you keep asking me that. She said, I done told you over and over again. She said, I don't know nothing. She said, I would know – if I knew something, she said, I'd tell you. I said, Well, okay. I don't want to, you know, aggravate you or nothing. I was just, you know, trying to help, you know, if somebody did this, help you get down to the bottom of it. I had no clue about nobody or nothing, and she didn't either.
>
> * * *
>
> Gulley: No. She said she didn't know anybody, anything. She didn't know anything.
>
> * * *
>
> Gulley: Did she say whether anybody had dreads?
>
> Defense: No. She said she didn't know. She just – she told me, I don't know why it is you keep asking me the same thing over again when I told you I don't know.

---

lights; and that she did not make a photo id until 4 months after the crimes, on April 5. (T 1382-83.)

(PCR 1569-70.) Ms. Gulley was aware that members of Mr. Hackworth's family were accusing Watkins of being involved in this crime and said that her unborn baby was not Mr. Hackworth's. (PCR 1571.) Ms. Gulley drove Ms. Watkins to the State Attorney's Office once for an interview. Someone at the prosecutor's office showed Ms. Watkins a picture of "somebody I didn't recognize," a "photo of a ski mask," and "a circumference area of…Mr. Kitt's cell phone in the area that it's saying he would have been in." (PCR 1572-73.)

Prior to Ms. Watkins' photo array identifications, Watkins texted Ms. Gulley a picture of someone Watkins believed was a suspect in this case, but Ms. Gulley did not recognize the person. Ms. Gulley then texted a picture of Mr. Kitt to Watkins, and Ms. Watkins said "No; that ain't him." (PCR 1574.) Ms. Watkins "never described anyone" to her, "[s]he couldn't." (PCR 1587.)

**John Gaddy:** Former Assistant State Attorney John Gaddy testified at the postconviction hearing. [5]  He conceded there was less evidence against Mr. Wilson than any of his co-defendants. (PCR 1654.) A glove with a partial mixed DNA was the only forensic evidence against Mr. Wilson, but Mr. Gaddy conceded it was "more likely than not Mr. Kitt was wearing the glove," not Mr. Wilson, because it

---

[5] Mr. Gaddy prosecuted Mr. Wilson, Saulsberry and Kitt for the Hackworth crimes (PCR 1606)

would be "unlikely" two people would have worn the same glove during a burglary.[6] (PCR 1635.) There was no other physical evidence against Mr. Wilson: no fingerprints, no footprints, no other forensic evidence. (PCR 1637.) Gaddy further acknowledged that Ms. Watkins' photo identification of Wilson occurred four months after the incident. (PCR 1645.)

Mr. Gaddy admitted Mr. Wilson "certainly did not confess to anything" and he denied any involvement in this crime to police. (PCR 1639.) Although Mr. Gaddy claimed Mr. Wilson's cell phone records had some inculpatory value because they indicated his phone was in the vicinity of Mr. Hackworth's apartment, instead of where he claimed he was, there were no text messages, voice mails, or anything else in the records that inculpated him. (PCR 1674-75.)

Mr. Gaddy also conceded that Mr. Nelson "was never incredibly consistent with the versions of events that he gave." (PCR 1608.) Nelson "told a lot of lies." (PCR 1646-47.) Mr. Gaddy agreed Mr. Nelson was a key witness for the prosecution. "Outside of Mr. Nelson's testimony," there would have been no evidence that Mr. Wilson was present for the dumping of the vehicle. Mr. Nelson "was one of the active participants in the crime so he was an integral part to the crime as a whole, for sure." (PCR 1641.)

---

[6] The postconviction court conceded that the evidentiary value of the DNA on the glove as to Mr. Wilson was "minimal" due to the "nominal amount of DNA consistent with" Mr. Wilson and the low population statistic. (PCR 1896.)

Mr. Gaddy admitted he was interested in Nelson's cooperation. (PCR 1651.) Mr. Gaddy testified that he met with Nelson "before he gave a deposition," and "downstairs in lockup before one of the trials…" Mr. Gaddy asked Nelson to tell him what happened. (PCR 1618.) Mr. Nelson's lawyer was not present for those meetings. (PCR 1608.) Mr. Gaddy also met with Nelson "several times" after he entered a plea.  (PCR 1624-25.) Mr. Nelson was "very well aware" that if he cooperated it would be considered by the Judge in imposing sentence. (PCR 1648.) Mr. Nelson "probably gained a big benefit" by cooperating with the state. (PCR 1650.) Mr. Gaddy remembers "there being several times" in Mr. Wilson's trial when Nelson was uncooperative, and Mr. Gaddy had to ask him if he had a problem testifying. (PCR 1653.)

Mr. Gaddy corroborated Mr. Nelson's postconviction testimony about Nelson's mother.  Gaddy recalled that Nelson "had raised concerns about his mom [Elease Robbins] for sure." It "wouldn't surprise" Mr. Gaddy that Nelson brought up concerns for his mother's safety. (PCR 1634.)  Mr. Gaddy received an email on September 17, 2013, prior to Mr. Nelson's plea on May 23, 2014,  concerning Ms. Robbins' arrest.  (PCR 1632-33.) Mr. Gaddy admitted his "surprise[]" that the Judge found probable cause to issue a warrant for Ms. Robbins. "I don't know if it rose to the level of a crime." (PCR 1660.) Despite Mr. Gaddy's observations as to the lack of evidence, Ms. Robbins' case was pending for "six or seven months," until her

charges were dismissed on April 8, 2014, a few weeks prior to Mr. Nelson's guilty plea.  (PCR 1633, 1671-72.)

Mr. Gaddy also recalled that Mr. Nelson had made "everybody aware" during his deposition that he had been Baker-Acted "several times," and was on medication, but Gaddy did not recall whether he looked into Nelson's mental disorders or the medication he was taking prior to Nelson's plea and the state's use of Nelson's testimony in his co-defendant's cases. (PCR 1652.)

Mr. Gaddy remembered that Mr. Nelson was "very concerned with his safety" in the jail and brought it up several times. (PCR 1619.) When asked whether Mr. Nelson told him he was jumped by inmates and beaten up by friends of Mr. Hackworth, Mr. Gaddy said it "may have happened" (PCR 1619.) "That would not be uncommon…" Mr. Gaddy was aware of Nelson's concerns about his safety prior to his plea. (PCR 1626.)

Mr. Gaddy remembered "[Stacey Gulley's] name coming up" but did not remember if he spoke with her. He met with Ms. Watkins "on more than one occasion" and "wouldn't be surprised if she had somebody with her." (PCR 1623.) Mr. Gaddy agreed that if Ms. Watkins was looking at photos of possible suspects prior to identifying alleged suspects in photo lineups, that would be the kind of evidence he would disclose to the defense so they "could test the credibility of the identification." (PCR 1657-58.)

**Patrece Cashwell:** Defense trial counsel Patrece Cashwell testified in Mr. Wilson's evidentiary hearing. She believes Mr. Wilson is innocent of these offenses. (PCR 1733.) She explained that Mr. Wilson was the last co-defendant arrested nearly four months after Mr. Nelson. (PCR 1686.) Mr. Wilson "always said he was absolutely innocent, not there at all…" and not guilty. (PCR 1712.) She explained that Mr. Wilson was a rapper, and "not involved in violence at all." It "made no sense that Mr. Wilson is going to be involved in a home invasion when "he's [a] peaceful…rap artist and you've got Trevon Nelson who is basically a thug, and…does these types of things and he's a drug addict at the time." (PCR 1730.) Mr. Wilson moved in "completely different circles" than Mr. Nelson. (PCR 1732.)

Ms. Cashwell believed Ms. Watkins lied at trial because: Watkins was a convicted felon; she lied when she testified that she called the police immediately after the incident; she gave multiple inconsistent descriptions to the police; and Watkins told Gwendolyn Hackworth, just a week prior to the kidnapping and murder, after Mr. Hackworth physically abused Watkins, "that Torrance [Mr. Hackworth] didn't have long anyway." (PCR 1692.)

All of Ms. Watkins' statements to the police "were inconsistent with each other." (PCR 1693.) In Watkins' first story to Officer Grant, given at 4:25 a.m. on December 24, she claimed four to five black males entered her home, and that "all of the men had dark clothing and ski masks on." (PCR 1693.) Watkins' story as to

the number of perpetrators fluctuated between "three to five…" (PCR 1775.) During the incident, Ms. Watkins' house was only lit by Christmas tree lights. Ms. Cashwell "had items to go on to impeach Ms. Watkins." (PCR 1697.)

Ms. Cashwell "heard whisperings" about Ms. Watkins looking at pictures prior to participating in photo lineups, but Cashwell "couldn't prove it." (PCR 1714.) She would "have loved to have had that" information because it would have provided "extra umph" to refute her identification of Mr. Wilson in a motion to suppress. (PCR 1715.)

Ms. Cashwell testified that Mr. Nelson was critical to the state's case against Mr. Wilson.  Ms. Cashwell did not think Mr. Wilson would have been charged without Nelson's testimony because Wilson's phone records were insufficient. (PCR 1735.) She did not believe Mr. Nelson's testimony.  (PCR 1731.) Mr. Nelson was a "confidence man," meaning he "was doing whatever was necessary to get himself out of trouble." (PCR 1697.) Nelson gave "inconsistent statements," was "a convicted felon," and "was guilty as sin in this, and… was doing anything to save his own neck." (PCR 1697.) Ms. Cashwell thought Nelson gave testimony to "get his mother off some charges." (PCR 1714.) It did not surprise Cashwell that the prosecution called Nelson as a witness despite his repeated lies and inconsistencies:

> [H]ere in Escambia County, that is kind of par for the course, and that's what they do. And unfortunately, what happens is the jury believes that if someone's admitting their own guilt and participation in a crime, then they must be telling the truth about the other participants.

(PCR 1718.) There was "just enough there" for the prosecutor to believe Nelson, but Ms. Cashwell believed that the holes in his trial testimony made his dishonesty apparent. Nelson's testimony "changed over time to fit…what Monica [Watkins] was saying. This is why Wilson "ended up being brought in last." (PCR 1723.) As Watkins' story changed, "[Nelson's] would change to replicate it. And then as his changed, hers would change to replicate it. So there was a connection." (PCR 1733-34.)

Ms. Cashwell always hoped Nelson would admit he was making up his story about Mr. Wilson's involvement, but that did not happen during her representation. (PCR 1719.) It would have been "wonderful" to have Mr. Nelson's instant recantation at the time of Wilson's trial, and Cashwell is not sure the State "would have even called [Nelson] if [his current recantation] had come to light." (PCR 1716.) She does not believe the grand jury could have indicted Mr. Wilson without Mr. Nelson. (PCR 1720.) She could have used Mr. Nelson's recantation at trial, including the fact that his mother was arrested and he needed to help the state or she would be prosecuted.

According to Ms. Cashwell's notes, the state's discovery revealed that the government met with Mr. Nelson on April 2, and just six days later his mother's charges were dropped, which was "very suspicious" to Ms. Cashwell. It appeared to Cashwell that "Trevon Nelson made a statement and…then his mother's charges

were dismissed." (PCR 1727-28.)

Ms. Cashwell explained the lack of evidence against her client: there was a shoeprint found on the door of Hackworth's apartment "that was not matched to Mr. Wilson," and DNA that did not come back to him at…various locations." (PCR 1700.) The mixture of DNA found on the glove contained "eight or nine combinations," not "maybe three people" as the state's expert believed. The DNA was weak and "actually implicated Mr. Deontrez [Kitt] more than it implicated Mr. Wilson." (PCR 1701.)

Ms. Cashwell's cell phone expert concluded that "based on the cell phone records and what date you were able to elicit, it still would not point to Anthony Wilson definitively being at [Hackworth's] house" because one of Mr. Wilson's girlfriends, was "literally right across the street" from Mr. Hackworth's. (PCR 1699.) Ms. Cashwell's cell phone expert "testified you couldn't definitively say that it was pinging from that…location." (PCR 1776-77.)   On the other hand, co-defendant Mr. Kitt's phone "was pinging in the victim's house, the boat ramp, and then back to Kitt's house." (PCR 1776.)

Ms. Cashwell believed the police got the dates wrong when questioning Mr. Wilson about where he was at the time of the murder. Cashwell explained, "[Wilson] didn't know what date the murder was…They had not told him what date the murder was." Mr. Wilson may have been near his grandmother's house on the 23rd like he

told the police, but the State "morphed that during trial into he said he was there on the 24th, and he wasn't." (PCR 1707.) The shooting of Mr. Hackworth occurred around 3:43 a.m., long after Mr. Wilson used his phone for the last time that night. (PCR 1711.) No one could identify Wilson at the scene of the shooting. Some "kids" who witnessed Hackworth get out of the Buick said there was a person with dreads there, but there are "lots of people with dreads." (PCR 1712.)

## ARGUMENTS

### Ground I

**Newly discovered evidence of the Trevon Nelson's recantation, along with all other admissible evidence, corroborate Mr. Wilson's fervent declaration of innocence and would probably produce an acquittal on retrial – and the state's denial of a new trial has resulted in a denial of Mr. Wilson's due process rights as guaranteed under the Fifth and Fourteenth Amendments.**

**I.      Exhaustion.**

This claim was exhausted in state court – Mr. Wilson raised a claim of newly discovered evidence concerning his co-defendant's recantation in his 3.850 motion(s), received a hearing on the issue, and appealed the postconviction court's denial of that issue on 3.850 appeal.  Further, he has consistently maintained and argued his actual innocence throughout his proceedings, including in the context of this claim.  Mr. Wilson further alleged that the failure to grant a new trial on this issue would result in a due process violation.  (PCR 1808, 1834.)

**II.     Applicable law.**

The Supreme Court has "struggled with" the question of whether a "freestanding claim" of actual innocence can be the basis for federal habeas relief. McQuiggin v. Perkins, 569 U.S. 383, 392, 133 S. Ct. 1924, 185 L. Ed. 2d 1019 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); Dist. Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 71, 129 S. Ct. 2308, 174 L. Ed. 2d 38 (2009) ("Whether such a federal right exists is an open question. We have struggled with it over the years, in some cases assuming, *arguendo*, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet.").

Petitioner acknowledges that the Eleventh Circuit has consistently found that freestanding claims of newly discovered evidence demonstrating actual innocence are not cognizable in non-capital federal habeas corpus petitions. However, the Circuit Court consistently addresses such claims on the merits in the alternative. See e.g. Mize v Hall, 532 F. 3d 1184, 1198 (11th Cir. 2008); see also In re Davis, 565 F.3d 810, 824 (11th Cir. 2009).

Mr. Wilson raises the instant claim for preservation purposes because "[o]ur criminal justice system makes two promises: a fundamentally fair trial *and* an accurate result." Livett, Caroline, 28 U.S.C. § 2254(j): Freestanding Innocence as Ground for Habeas Relief: Time for Congress to Answer the Court's Embarrassing

Question, LCLR, Vol. 14:4, 1662 (Dec. 15, 2010). "[E]ven a prisoner who appears to have had a *constitutionally perfect* trial 'retains a powerful and legitimate interest in obtaining his release from custody if he is innocent of the charge for which he was incarcerated." Herrera v. Collins, 506 U.S. 390, 440 (1993) (Blackmun, J., dissenting).

## III.    Factual Background.

Trevon Nelson was a co-defendant of Mr. Wilson.  The state utilized Nelson's testimony in each of his co-defendant's trials.  At Mr. Wilson/Kitt's trial, Nelson testified that: Kitt hatched a plan to rob Mr. Hackworth, known as "T", at his trailer along with Nelson and co-defendant Saulsberry.  Nelson left Kitt's trailer and went to a woman's house at the Sanchez Court apartments, which was next door to "T's" apartment.  Nelson was in contact with Saulsberry and Kitt during this time. Wilson also showed up at the woman's house. Nelson contacted Kitt and Saulsberry and told them to come over to the house.  (T 737-39).  When Kitt and Saulsberry arrived, their previous plan to rob "T" came up.  (T 740.) Nelson, Kitt, Saulsberry, and Wilson then went to "T"s house, confronted "T" at his door, and things got out of control, resulting in the events in question.  (T 741.) The prosecutor relied heavily on Nelson's testimony at trial, mentioning it at least 17 pages of the closing argument.  (e.g. T 1323-24, 1328, 1329, 1330-31, 1341, 1344-45, 1346, 1348-1353, 1356-58, 1360, 1362.)

Years after Mr. Wilson's conviction, he was provided a letter from Mr. Nelson admitted that Nelson testified falsely against Wilson at trial. Mr. Wilson's postconviction counsel sent an investigator, Rachel Aaron, to speak to Mr. Nelson in prison concerning this letter. On October 13, 2017 in Madison Correctional Institution, Mr. Nelson admitted to Ms. Aaron that prior to implicating Mr. Wilson in the instant offenses, he was under tremendous pressure to come forward with a believable story including snitching on supposed accomplices. Not only did the prosecutor pressure him and threaten him with the death penalty, but he received threats from jail personnel and inmates associated with Torrance Hackworth. Nelson informed Ms. Aaron that he suffers with lifelong mental illness, was suffering with mental illness at the time of his statements in this case, and was taking street drugs and pharmaceuticals for his mental health issues at the time. (PCR 131, 1449.) Mr. Nelson thereafter signed an affidavit drafted from Ms. Aaron's notes. (PCR 213-14.)

During the 2019 evidentiary hearing before this Court, Mr. Nelson provided an entirely different account than what the jury heard in Mr. Wilson's 2014 trial – one that details Mr. Wilson's innocence and wrongful conviction:

1. Mr. Wilson's refusal to participate in this robbery

Contrary to his trial testimony, Mr. Nelson explained Mr. Wilson was not present for the home invasion, kidnapping, or shooting of Mr. Hackworth. (PCR

1444.) On the night of the crime Mr. Nelson went to see Mr. Wilson and told him he "was fixing to go commit a robbery." Mr. Nelson "didn't mention any names," but Mr. Wilson told Nelson he was not interested and did not "want nothing to do with that…I'm trying to enjoy my Christmas with my kids." Mr. Wilson was also not into robbing people, and instead was "an inspiring rapper at the time." (PCR 1445).

2. <u>The idea to include Mr. Wilson</u>

When police made it clear to Mr. Nelson that his family would suffer if he refused to name people involved in the crimes, he started making things up:

> At that point in time, my mother was brought up there. She was just like – they opened the door and let me see, and they closed the door back. She was standing out there crying, and I asked to speak with her. They didn't allow it. They just closed the door back, and they began to question me about the Torrance Hackworth incident, who was involved and who wasn't involved, and I gave a lengthy list of names of who was involved. At that time they arrested me for the murder of Torrance Hackworth.

(PCR 1441-42.) The pressure by the police to have Nelson give them names contributed to the wrongful conviction. Mr. Nelson asked to see his mother, but the detective told him "[n]o. You're never going to see her again if you don't tell us something," so Mr. Nelson "just started filling in the blanks:"

> Whatever questions he was asking, I was just – I was just filling in the blanks for people that I just knew – do you know what I mean – to fit that description.
>
> Mr. Wilson – when he said somebody with dreads or whatever, Mr. Wilson was the first one who came to my mind, you know. That's why Mr. Wilson came up in this unfortunate and devasting incident. He

was just a fill-in, you know. He didn't deserve what I did to him, you know. I should have took responsibility for my actions and didn't assist the State in their witch hunt for just getting a high profile case solved.

(PCR 1451-52.)

### 3. Mr. Nelson's mother's arrest and the mounting pressure for a story

Mr. Nelson would do anything for his mother, and he was concerned that the police would retaliate against her if he did not help them with the Hackworth murder investigation. (PCR 1553-54.) Nelson's fear was realized when his mother was arrested for "tampering with a witness," and was he informed that "unless I keep participating, that my mother was going to get a long time in prison." (PCR 1455.)

Law enforcement told Nelson all he had to do to get his mother's charges dropped was to cooperate.[7] (PCR 1454.) Nelson believed he had no choice but to tell the state what they wanted to hear, even if it meant implicating an innocent person:

> Yes. It was traumatic all the way around. It was traumatic all the way around dealing with these particular circumstances because my mother was basically prosecuted for something that I did, and it was traumatic because somebody was betrayed that was innocent…

(PCR 1454.). His mother's mental and physical health was also on Mr. Nelson's mind.  She had "a slight heart attack, in and out of the hospital. She takes like fifteen, twenty pills a night and yeah, she's been through a lot. She most definitely suffered."

---

[7] Interestingly, the record confirms that Ms. Robbins' charges were dropped on April 8, 2014 shortly before Mr. Nelson entered a plea in this case and agreed to testify against Saulsberry, Kitt and Wilson. (PCR 1206.)

(PCR 1456.)

Mr. Nelson explained that federal authorities were also visiting him in the jail seeking assistance on a federal case against people he grew up with. (PCR 1460-61.)

### 4. Nelson's Repeated Refusal to Cooperate with the Prosecution

Nelson's reluctance to implicate Mr. Wilson in this offense is reflected in his actions, and he tried to back out of cooperating with the state "numerous times…" The first occasion occurred during his initial interview with the Pensacola Police Department, the second was when he was transferred to Santa Rosa and was talking with federal agents, and the third was "prior to me testifying against Mr. Wilson." Mr. Nelson told the government "I was good…I'm not going to assist in getting an innocent man [Mr. Wilson] convicted…and then he brought up the situation with my mother again, with her being charged and not being charged…[so] I reluctantly went along with it." (PCR 1464-65.)

### 5. Mr. Nelson was Receiving Threats from all Angles

Mr. Nelson also provided names in this case because Mr. Hackworth had been part of the "A Street Mafia" and Mr. Nelson was put in a cell "with known affiliates of Mr. Hackworth" following his arrest. (PCR 1456-57.) Nelson was "under tremendous pressure" and "was being assaulted on a [sic] numerous basis" at the county jail by Mr. Hackworth's associates. Nelson was "being jumped on by three or four people at a time." He explained:

> I was being jumped on repeatedly. My food was being taken. I was receiving threats by the victim's affiliates on the street about protecting my loved ones, about setting my mother's house on fire, and I was taking medication at the time.
>
> Due to that, due to me growing up inside the Lakeview Center, in and out being a mental patient – and my mother was coming up. She was crying repeatedly, and I just had to think of something just to take the pressure off. He was the first person in – he was the first person that came to my head because I just seen him like an hour, a couple of hours before. He was inside the studio rapping.

(PCR 1451.)

### 6. Mr. Nelson's Mental Health Disorders and Commitment

Mr. Nelson's mental health also contributed to his capitulation to police and gang demands.  Mr. Nelson has suffered with bipolar disorder, "severe depression," and several other mental disorders since he was four or five years old. He was institutionalized at Lakeview Center for his "whole childhood, adolescence," and was at the Crisis Stabilization Unit during his "[y]ounger teenage years." (PCR 1457-58.) Mr. Nelson was treated for his "severe mental disorders." He has been on "Zoloft, Seroquel, Ritalin, Adderall and a couple of more" that he could not recall at various times. (PCR 1458.)  Nelson has also has been Baker Acted twice. Nelson's mental illnesses made him more susceptible to pressure and coercion. (PCR 1459.)

### 7. How Mr. Nelson was able to Make up a Convincing Story about Mr. Wilson's Involvement

Because Mr. Nelson knew Mr. Wilson, because Nelson was an active participant in this crime, and because law enforcement gave Nelson "descriptions,

heights, detail of the crime scene…basically a review of what happened…" it was easy to implicate Mr. Wilson as one of the perpetrators.  (PCR 1461.) (PCR 1453.)

Prosecutor Jeff Gaddy met with Mr. Nelson prior to his depositions and trial testimony. (PCR 1461.) Nelson was shown "descriptions of the person who did it," and an "outline, as far as the crime scene." When Gaddy originally asked Mr. Nelson was happened and Mr. Nelson told him, Gaddy's reply that was that's "not what happened. This is what happened." (PCR 1461-62.) Gaddy told Nelson about Wilson, Kitt and Saulsberry's involvement, because Gaddy wanted "everything to correlate…everything to fit in…" (PCR 1462.)

8.  <u>Mr. Nelson's Reasons for Telling the Truth Now</u>

When Mr. Nelson was asked why he decided to tell the truth now, he explained it was about freeing an innocent man and recognizing his own selfishness:

> Why come forward now? I mean, it's because I'm living a different life now. At one point in time – at one point in time I didn't care about nobody, you know. I'm not saying I'm an innocent man. I'm most definitely guilty, you know of my crimes. You know, I'm most definitely guilty; but just to see an innocent man go down because I didn't care about myself – you know, I didn't care about nobody else. The only thing I cared about was my mother.
>
>           So it's not the issue about me coming forward now. It's the issue about me living a spiritual life now…
> * * *
> Seeing an innocent man convicted and sentenced to life from my shortcomings and my downfalls in life, I feel that is a travesty to not only myself but the judicial system that America was built on…
> * * *
> Unfortunately, so, that's what happened inside Mr. Wilson's case. I was

pressured. I was beat up. My mother was charged. My family was threatened. The federal agent was threatening to indict everybody I loved, everybody that I growed [sic] up with, close affiliates, close friends, and, I mean, I filled in the blanks by getting Mr. Wilson convicted of something he had nothing to do with. I can honestly say that this man – he's innocent. So I've got to – it's not about why I come forward now, you know. It's the part – it's about freeing an innocent man.

(PCR 1465-66.)

## IV.   Legal analysis.

It was undisputed below that this claim was timely filed.  Thus, the inquiry at the state level turned on whether Mr. Nelson's recantation, along with all other admissible evidence would probably produce an acquittal on retrial.

### A. The State court's decision was an unreasonable determination of the facts in light of the evidence presented in state court:

#### 1. The state court's credibility determination is an unreasonable determination of the facts.

The postconviction court's attempts to deny Mr. Wilson's ability to have a new trial on this evidence represents a striking example of a court doing everything it can to deny relief without a valid reason or any reasonable basis to do so. While ignoring the facts corroborating Mr. Nelson's recantation and Mr. Wilson's innocence, the lower court claimed that the recantation was not credible, and that Mr. Nelson testified at trial because "he feared one of them [Kitt or Wilson] would testify against him." (PCR 1895.)   This finding is not supported by competent substantial evidence because neither Kitt nor Wilson gave a statement in this case,

and Nelson entered his plea prior to testifying in Kitt and Wilson's trial. (PCR 1895.)

The lower court then claimed that Ms. Robbins' testimony should be given "minimal weight" in Nelson's credibility analysis because her testimony was "disjointed, inconsistent and not credible." (PCR 1600, 1894 n. 12.) This finding ignored that court records conclusively demonstrate Ms. Robbins *was arrested and facing prosecution while the charges against Mr. Nelson were pending*, that prosecutor Gaddy agreed Nelson was concerned about his mother, and that Ms. Cashwell confirmed that Nelson met with the state on April 2, just a week prior to Ms. Robbin's charges being dropped.

The lower court also asserted Ms. Watkins' photo identification refutes Nelson's recantation. (PCR 1895.) However, that finding unreasonably ignores that Ms. Watkins' identification of Mr. Wilson was "vigorously" impeached at trial (PCR 1892); Watkins' undermined her own trial testimony in postconviction *by confessing her photo identifications were tainted*. Stacey Gulley testified that Ms. Watkins could not independently recall *anything* about the suspects, was provided information about potential suspects by the community at large, and that when shown a photo of Mr. Kitt prior to her photo id, she denied he was involved. (PCR 1568 et seq.)

The lower court also attempted to corroborate Nelson's *trial* credibility (as opposed to his recantation) by citing trial testimony from witnesses at S and Blount

Street that one of the suspects had dreadlocks, which Wilson had at the time of the incident. (PCR 1891.) However, there is no evidentiary significance to the fact that one of the assailants had dreadlocks, unless the postconviction court believes that Mr. Wilson was the only black male with this hairstyle in Pensacola at the time of the crimes. Even if this fact is significant in identifying Mr. Wilson, Mr. Wilson had long dreadlocks, not "twigs" as eyewitness Ms. Watkins described to law enforcement – a fact the postconviction court's analysis also omits. (PCR 2100-11.)

Additionally, the lower court's finding that "[c]ell tower records established that Defendant's phone was in the vicinity of the victim's apartment, the area where the victim was shot, and the location where the Buick was sunk during the early-morning time-frame…which is consistent with Nelson's testimony," is factually incorrect, therefore also objectively unreasonable.[8] (PCR 1895.) The evidence established at trial and argued in the state's close, was that *Kitt, Saulsberry, and Nelson's phones* pinged off of towers in the vicinity of the victim's apartment, S and Blount, and the boat ramp. (T 870-76, 886-89, 1365-66.) As conceded by the state during closing argument, and during the evidentiary hearing, the only inculpatory cell tower evidence concerning Wilson, which was rejected by a defense expert, was

---

[8] The lower court's confusion concerning the cell phone evidence again supports Mr. Wilson's claim that counsel was ineffective in failing to move to sever the trials of Kitt and Wilson because the jury would have been unable to distinguish the evidence presented against Mr. Kitt from the evidence against Mr. Wilson.

that he was in the vicinity of Mr. Hackworth's apartment. (T 878-83, 1186, 1397.) Where Nelson said he met Mr. Wilson at a woman's apartment across the street from Hackworth's, Wilson's phone would have pinged off that tower even if he was not involved in the crimes. (T 737; PCR 1699.)

The lower court's fervent attempt to discredit Nelson's recantation continued with its assertion that Nelson was merely reading from his affidavit during the hearing. (PCR 1896.) This finding ignores that Mr. Nelson answered *several transcript pages of questions without the aid of his affidavit,* prior to postconviction counsel handing him the affidavit, for the purpose of confirming the accuracy of the statements in the document. (PCR 1437-48.) Mr. Nelson read from and looked at his affidavit during subsequent testimony because it was relevant to the questions being asked of him and his answers. (PCR 1449-52.) Mr. Nelson cannot be deemed non-credible for reading from the affidavit because he was instructed to do so by postconviction counsel.

Based on the foregoing, the trial court's credibility determination is based on an unreasonable determination of the facts, is not supported by the competent substantial evidence in this case, and is at times, literally wrong. See Ward v. Hall, 592 F.3d 1144, 1178 (11th Cir. 2010) (finding that state court made an unreasonable determination of the facts in light of the affidavits and testimony in the case); Smith v. Campbell, 620 F. App'x 734, 751 (11th Cir. 2015)(the Alabama Court of Criminal

Appeals' finding that there the inmate conclusively did not possess significantly subaverage intellectual functioning and there was "no indication that Smith had significant defects in adaptive behavior," were unreasonable determinations of the facts) (**unpublished opinion**); see also Payne v. State, 74 So. 3d 550, 555 (Fla. 5th DCA 2011)("The trial court concluded that Holloway could not be believed. To reach this conclusion, the court expressly relied upon non-record evidence, consisting of Holloway's taped confession in which he denied that he was the shooter and implicated Appellant. On rehearing, the court acknowledged its improper reliance on this testimony, but stated that it would have reached the same conclusion without consideration of this evidence… Although credibility is an issue for the trial court, we are not bound by credibility determinations that are not based on substantial, competent evidence. Here, Holloway's testimony corroborates that of Reggie, Allen's girlfriend, and Holloway's jail cellmate. It is consistent with his assertion at trial that he had "never seen" Appellant. It is also consistent with the fact that the motive for the shooting was the earlier altercation, which did not involve Appellant. Moreover, the theory of defense was mistaken identity and Holloway implicated his own cousin"); State v. Spaziano, 692 So. 2d 174, 176 (Fla. 1997) ("Apart from the recantation testimony offered directly by DiLisio, independent corroborating evidence was introduced that lent credence to DiLisio's description of the events leading up to his original statements. In fact, the trial judge wrote that

'[DiLisio] now testifies that he did not tell the truth during the trial and provides a complicated explanation of the events which led up to his trial testimony. This testimony is credible and is corroborated by other evidence to a significant extent.'")

## 2. The state court unreasonably discounted significant evidence corroborating Mr. Wilsons's innocence and Mr. Nelson's recantation

The state postconviction court unreasonably discounted – or did not consider at all— independent evidence corroborating Nelson's recantation. See State v. Spaziano, 692 So. 2d 174, 176 (Fla. 1997) ("Apart from the recantation testimony offered directly by DiLisio, independent corroborating evidence was introduced that lent credence to DiLisio's description of the events leading up to his original statements. In fact, the trial judge wrote that '[DiLisio] now testifies that he did not tell the truth during the trial and provides a complicated explanation of the events which led up to his trial testimony. This testimony is credible and is corroborated by other evidence to a significant extent.")

- Evidentiary hearing testimony of prosecutor Jeff Gaddy corroborated Mr. Nelson and that the evidence against Wilson was less than any of his co-defendants

The prosecutor, Jeff Gaddy, testified at the 3.850 hearing, and agreed, as testified by Mr. Nelson, that he met with Mr. Nelson "before he gave a deposition," and "downstairs in lockup before one of the trials…" (PCR 1608.) Mr. Nelson did not have a lawyer present for these meetings. (PCR 1608.) Mr. Gaddy agreed that

also met with Nelson several times after Nelson entered a plea. (PCR 1625-26.) According to Gaddy, Nelson was "very well aware" that his cooperation would be considered by the sentencing judge. (PCR 1648.) Mr. Gaddy was interested in Nelson's cooperation. (PCR 1651.) If Mr. Nelson did not cooperate, Mr. Gaddy "would have been comfortable making an argument…that he should be sentenced to life in prison." (PCR 1650.)

Mr. Gaddy conceded Nelson "was never incredibly consistent with the versions of events that he gave." (PCR 1608.) There were "certainly differences" in the details of Nelson's testimonies between Saulsberry and Kitt/Nelson's trials. (PCR 1609.) Mr. Nelson "told a lot of lies [during the investigation of this case]. I don't think anybody is going to disagree with that." (PCR 1646.)

Mr. Gaddy also recalled that Nelson's mother Ms. Robbins was arrested and charged around the time of Nelson's arrest, and Nelson had addressed his concerns about her well-being to Mr. Gaddy. (PCR 1633-34.) Mr. Gaddy received an email on September 17, 2013 informing him that Ms. Robbins, had been arrested. (PCR 1632.) Detective Parsons (the detective in Wilson's case) may have also told him about Robbins' arrest. (PCR 1632.) Ms. Robbins' case was pending for seven or eight months and dismissed a just weeks prior to April 8, 2014, when Mr. Nelson formally entered his plea, despite that Gaddy admitted that they probably did not even have probable cause to arrest her. (PCR 1632-33, 1660, 1671-72.)

Gaddy also recalled that prior to Nelson's plea and "even during his deposition" Nelson made "everybody aware" that he had been Baker Acted "several times," and was on medication, but Gaddy never looked into that issue. (PCR 1652.)

Mr. Gaddy recalled that Mr. Nelson was "very concerned with his safety" in the jail and brought it up several times. (PCR 1618.) Nelson "may have" been jumped by friends of Mr. Hackworth in jail. (PCR 1618-19.) "That would not be uncommon" for friends and family of the deceased to threaten a suspect. (PCR 1626.) Mr. Gaddy was aware of Mr. Nelson's concerns about this safety prior to entering his plea. (PCR 1626.)

Mr. Gaddy agreed that there was less evidence against Mr. Wilson than any of his co-defendants. (PCR 1654.) He had the most evidence against Deontrez Kitt. Mr. Gaddy agreed that a glove with a partial mixed match to Mr. Wilson was the only forensic evidence used against Wilson, and that "more likely than not Mr. Kitt was wearing the glove," during the crimes because it was "unlikely" the same glove would have been worn by multiple persons during a single robbery.[9] (PCR 1635.) Mr. Gaddy also acknowledged that his DNA expert at trial could not say it was Mr.

---

[9] Aside from Mr. Gaddy's admission to the insignificance of DNA as it related to Mr. Wilson, the State's expert conceded at trial he could not say it was Wilson's DNA. (T 1191.) The DNA expert also testified at trial that Wilson's DNA was excluded from all the other evidence that was tested, including a mop handle, black ski mask, a sock, duct tape, Mr. Hackworth's fingernails, high top shoes, and a stain on a seat cover. (T 1214-15.)

Wilson's DNA on the glove because it was a mixture. (PCR 1635-36. There was no other physical evidence linking Mr. Wilson to the crimes: no DNA, fingerprints, footprints, etc. (PCR 1337.)

Mr. Wilson "certainly did not confess to anything" and he denied any involvement in this crime to police. (PCR 1639-40.) Mr. Gaddy also did not recall any evidence that Mr. Wilson was present at Kitt's trailer when the plan to rob Mr. Hackworth was hatched. (PCR 1640.) "Outside of Mr. Nelson's testimony," there was no evidence Mr. Wilson was present when the car was dumped. (PCR 1641.) Mr. Nelson "was one of the active participants in the crime so he was an integral part to the crime as a whole." (PCR 1641.)

Mr. Gaddy recalled that the only thing inculpatory about Mr. Wilson's cell phone records is that he was communicating with the co-defendants and his phone was in the vicinity of the crime during the time of the crime, instead of where he claimed he was.[10] (PCR 1674-75.) There were no text messages, voice mails, or anything that directly inculpated him. (PCR 1674-75.)

- Evidentiary hearing testimony and case records of Ms. Elease Robbins corroborate Nelson's testimony that she was wrongfully arrested and charged, then released because Nelson started cooperating with law enforcement

Mr. Nelson's mother, Ms. Robbins, testified at the 3.850 hearing that she was

---

[10] The defense expert testified that Hackworth's apartment was not in the cell tower radius that Mr. Wilson's phone pinged off of at 2:40. (T 1186.)

arrested on September 13, 2013 for cyberstalking. There were "so many" police officers at her house - around "[t]wenty to twenty-five" officers in approximately "twelve or thirteen cars." They were armed and told her they had a warrant for an arrest. (PCR 1528-29.) She was scared and did not understand why she was being arrested. (PCR 1529-30.) She received threats from Mr. Hackworth's mother and other people "telling me what they was going to do to my family and me." (PCR 1531-32.) She is "now PTSD. I'm bipolar. I'm diabetic. I have high blood pressure. I have rheumatoid arthritis." She had undergone mental health treatment four time following this event at Lakeview Center. (PCR 1523-31.)

Ms. Robbins talked to her son Mr. Nelson about her arrest. (PCR 1532.) Criminal charges were filed against her on October 4, 2013. Her charges were dropped on or about April 8, 2014. (PCR 1541.)

Ms. Robbins also corroborated Mr. Nelson's testimony about his own mental illness, testifying he has seen "[p]lenty" of doctors, and the decision for Mr. Nelson to see a psychologist was both her idea as well as a recommendation by the school he was it. (PCR 1534.)

- <u>Monica Watkins' postconviction testimony corroborates Mr. Wilson's innocence</u>

Ms. Watkins testified in the 3.850 evidentiary hearing that she met with Mr. Hackworth's relatives the night Mr. Hackworth was taken to discuss "how many people was in there and what all happened." (PCR 1546-47.) She discussed the

robbery with "[e]veryone," including Mr. Hackworth's "mother, his grandmother, his sister, his brother, cousin, my mother." (PCR 1548.)

Ms. Watkins testified, consistent with Stacey Gulley's postconviction testimony, that Watkins had a picture of Mr. Kitt and asked Gulley whether Gulley knew him. (PCR 1551.)  She got his picture because "it was public."  (PCR 1551.) "A lot of people was identifying" Mr. Kitt as a suspect. (PCR 1551-52.)    In fact, "not even thirty minutes" after the robbery, well before any police identification was made by Ms. Watkins, she was shown a picture of Mr. Kitt by Rachel Hackworth asking whether he was one of the individuals involved in the crime. (PCR 1552, 132. Rachel Hackworth also showed Watkins a picture of someone with dreads that night, asking if the person involved. (PCR 1552.)

Watkins denied, during the evidentiary hearing, ever stating under oath that all of the suspects had masks on.  (PCR 1548.) She did not recall testifying at trial that she can only see a few feet in front of her without her glasses and that the house was dark except for Christmas lights at the time of the robbery, and denied that testimony was accurate.  (PCR 1549-50.)  She conceded that people were accusing her of being involved in the crimes because she and Mr. Hackworth had a fight a couple of nights before.  (PCR 1550.)

- <u>Stacey Gulley's postconviction testimony corroborating Mr. Wilson's innocence</u>

Ms. Gulley testified at Mr. Wilson's evidentiary hearing that she had been

friends with Monica Watkins for about ten years.[11] The day after the incidents in

question occurred, Ms. Gulley want to Mr. Hackworth's grandmother's house and

saw a "whole bunch of people" there, including Ms. Watkins. (PCR 1566.) Over the

course of a couple days, Ms. Gulley played "detective" and tried to jog Watkins'

memory:

> A    I asked [Watkin]. Were they tall? Were they short? Were they
> fat? Did they have dreads? Did they have gold in their mouth?
> What kind of shoes were they wearing? What were their skin
> color, anything, and she said, I don't know why you keep asking
> me that. She said, I done told you over and over again. She said,
> I don't know nothing. She said, I would know – if I knew
> something, she said, I'd tell you. I said, Well, okay. I don't want
> to, you know, aggravate you or nothing. I was just, you know,
> trying to help, you know, if somebody did this, help you get
> down to the bottom of it. I had no clue about nobody or nothing,
> and she didn't either.

> Q    Did she say that she was able to identify anybody?

> A    No. She said she didn't know anybody, anything. She didn't
> know anything.

> A    Did you ask her whether anybody had dreads?

> Q    Oh, yes. I asked her. I said, Did they have dreads? Where they
> baldheaded? I mean, Did they have a hat? Did they have a hat
> not on? How big was their feet? I mean, if you can imagine a

---

[11] As explained in the following claim, Ms. Gulley was available to testify at Mr.
Wilson's trial, but was never contacted by the defense. (PCR 1575-76.) Aside from
being a stand-alone claim in Mr. Wilson's 3.850 motion, Ms. Gulley's testimony
must be considered as part of this newly discovered evidence claim in determining
whether to grant a new trial as it would be used as rebuttal on retrial. *See Johnston,*
27 So. 3d at 20 ("newly discovered evidence must be considered in the context of all
admissible evidence").

> question I asked, like going over somebody with a fine tooth comb, I asked her all those questions.

A  Did she say whether anybody had dreads?

Q  No. She said she didn't know. She just – she told me, I don't know why it is you keep asking me the same thing over again when I told you I don't know.

A  Is it a fair statement to say that Ms. Watkins could not provide you any description of the suspects when you asked her?

Q  Not at all. She didn't – she couldn't even say whether they were midgets….

(PCR 1568-70.) Ms. Watkins was also under pressure to make an identification, because members of Mr. Hackworth's family thought Watkins was involved, believing she was lying about being pregnant with Hackworth's baby.  (PCR 1571.) Ms. Gulley drove Ms. Watkins to the State Attorney's Office on one occasion and observed her interview with the prosecutor.   Someone at the prosecutor's office showed Ms. Watkins a couple of photos of people, a "photo of a ski mask," and "a circumference area of…Mr. Kitt's cell phone in the area that it's saying he would have been it." She recalls seeing Mr. Saulsberry's face in a photo.  (PCR 1571-73.)

Prior to Ms. Watkins being shown either photo lineup with Mr. Kitt or Mr. Wilson's pictures, Watkins texted Gulley a picture of someone she believed was a suspect in this case, but Ms. Gulley did not recognize the people. Ms. Gulley then sent a picture of Mr. Kitt to Watkins, and Ms. Watkins said "No; that ain't him." (PCR 1574.) Ms. Watkins "never described anyone" to her, "[s]he couldn't." (PCR

1587.)

- Defense counsel Ms. Cashwell's investigation led her to the conclusion that Wilson is innocent

Mr. Wilson's trial counsel, Patrice Cashwell, believes Mr. Wilson is innocent and this is a case of mistaken identity. (PCR 1733.) The evidence supporting her conclusion including that Ms. Watkins gave three stories to police and each of them "were inconsistent with each other." (PCR 1693.)  At 4:25 a.m. the morning of the incident, she told the Officer Grant that four to five black males had entered her home, "all of the men had dark clothing and ski masks on," and "she said she could not see any of their faces."  (PCR 1693.) During the incident, Ms. Watkins' house was only lit by Christmas tree lights. According to Ms. Cashwell "I had items to go on to impeach Ms. Watkins." (PCR 1697.)

It would have "been wonderful" for the defense case to have Mr. Nelson's recantation at the time of trial, and Ms. Cashwell is not sure the State "would have even called this witness if this had come to light." (PCR 1715-16.) Without knowing what evidence the state presented the grand jury, Cashwell is not sure they would have indicted him had Nelson recanted at that point. (PCR 1720.)

Ms. Cashwell thinks that the timing of Mr. Nelson's mother's arrest and subsequent release was 'very suspicious" because the state interviewed Mr. Nelson at the Santa Rosa Jail on April 2, and then *six days later* his mother's charges were dropped. (PCR 1727-28.)

Ms. Cashwell also explained the lack of evidence linking Mr. Wilson to the crimes: there was a shoeprint found on the door "that was not matched to Mr. Wilson," and "DNA that did not come back to him at…various locations." (PCR 1700.) Cashwell explained that the State's DNA expert was wrong about the mixture of DNA found on the glove, as it contained "eight or nine combinations," and not "maybe three people" like the expert believed. The DNA "implicated Mr. Deontrez [Kitt] more than it implicated Mr. Wilson." (PCR 1701.)

Concerning cell phone records, Ms. Cashwell's cell phone expert concluded that the cell records "would not point to Anthony Wilson definitively being at that house." (PCR 1699.)  In any event, the house Mr. Wilson was supposedly at just prior to the robbery was "literally right across the street" from Mr. Hackworth. (PCR 1699.) While Cashwell did not like that the cell phone did not "beep" off his girlfriend's location "up north" [near Wilson's grandmother's as Wilson told detectives], Ms. Cashwell pointed out that the police got the dates wrong when questioning Mr. Wilson about where he was at the time of the murder. Cashwell explained, "[Wilson] didn't know what date the murder was…They had not told him what date the murder was." The police were asking Mr. Wilson *about the 23rd* but the State "morphed that during trial into he said he was there on the 24th, and he wasn't." (PCR 1707.)

**B.  Mr. Wilson is actually innocent and would be acquitted based on all available evidence on retrial – the state court's decision was contrary**

**to or an unreasonable application of clearly established federal law.**

As explained by Mr. Wilson in his 3.850 proceedings in the state court (PCR 1834-35), the Fifth Amendment to the United States Constitution provides that "[n]o person" "be deprived of life, liberty, or property, without due process of law…" This fundamental principle imposes upon the Court the responsibility to correct a conviction 'brought about by methods that offend a sense of justice.' *Rochin v. California*, 342 U.S. 165, 173 (1952)(internal citations omitted). Convictions obtained through false evidence results in a due process violation because it denies the accused the constitutional right to a fair and impartial trial. Townsend v. Burke, 334 U.S. 736, 741 (1948)(a sentencing court's reliance on materially false information violates due process of law and observing that it is "a requirement of fair play" that a criminal sentence not be "predicated on misinformation.") Thus, a new trial must be granted in the context of newly discovered evidence, if a defendant would probably be acquitted at trial.  Richardson v. State, 546 So. 2d 1037, 1039 (Fla. 1989).

Mr. Nelson's recantation would probably produce an acquittal on retrial given Mr. Nelson's vacillating positions from the onset of this case, and Ms. Watkins' evolving descriptions of the assailant with dreadlocks.  See Wearry v. Cain, 136 S. Ct. 1002, 1006 (2016)("Beyond doubt, the newly revealed evidence suffices to undermine confidence in Wearry's conviction. The State's trial evidence resembles

a house of cards, built on the jury crediting Scott's account rather than Wearry's alibi. See United States v. Agurs, 427 U.S. 97, 113 (1976) ("[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.")).

The state court admitted that Trevon Nelson's testimony was "the main evidence against Defendant [Mr. Wilson] at trial" (R 1890) and Ms. Watkins' photo identification, the other primary evidence against Wilson, was "vigorously impeached at trial" with prior inconsistent statements, the lighting in the apartment, and "particularly, Ms. Watkins' description of the hairstyle of the suspect she identified" as Mr. Wilson. (PCR 1892.)

Ms. Watkins' photo identification as to Wilson has always been questionable. Trial testimony revealed that she is a convicted felon who sold drugs out of her home. (T 1379.) She originally said that all of the suspects were wearing masks during the events, but she later said that two or three were not wearing masks (T 1400); she initially stated that the dreadlocked assailant had short "twig" dreadlocks, he was dark-skinned, and he was between 5'6" and 5'7." However, Mr. Wilson had long dreads at the time (T 1381), he is not dark skinned, and stands at 5'11" tall (R 4-6 - arrest report); Watkins also conceded at trial that she was not wearing her glasses at the time of the crimes; the house was only lighted by Christmas lights; and she did not make a photo id until 4 months after the crimes. (T 1390-93.)

Further, the value of Ms. Watkins' photo id would be further reduced on retrial where Stacey Gulley would testify that Ms. Watkins was unable to identify any of the suspects' characteristics following the crime, was provided tips and shown photos of potential suspects by other people prior to participating in the photo lineups, and that she denied that Kitt was involved when shown his picture prior to her photo identification. Finally, the potential DNA hit to Wilson has no inculpatory value. Kitt was a match to the DNA on the glove and the state concedes that he likely wore it during the crimes, not Wilson. (T 1353-54.)

Mr. Wilson has established his innocence and probability of being acquitted on retrial.

## **Ground II**

**The prosecution improperly shifted the burden of proof and commented on Mr. Wilson's right to remain silent at trial through argument and presentation of evidence that Mr. Wilson did not advance a valid alibi, resulting in violations of Mr. Wilson's right to silence and due process under the Fifth and Fourteenth Amendments.**

**I.     Relevant facts.**

On September 2, 2014, Petitioner Wilson's defense counsel filed a Notice of Alibi, listing Stephanie Gideon as an alibi witness.  (R 1784.)  Counsel later withdrew this notice and filed a pre-trial motion in limine on November 3, 2014, seeking to preclude "any comment or statement by the State about an alibi to include the recorded statement by the Defendant until and unless the Defense advances the

defense of alibi."  (R 2091.)

During the state's opening statement in Petitioner Wilson's trial, defense counsel lodged the following objection:

Defense:       The reason for my objection that, as stated on Friday, the State cannot introduce any evidence even – or make any argument in opening statement regarding any alibi until it's first introduced by Defense.

State:         I'm only talking about his interview and arrest.  I'm not going to talk about alibi.

Defense:       But he talks about – he said that he – that he was not there at that time.  Are you planning to go into that because that would be introducing –

Court:         Do you agree that you're not to get into those details in your opening?

State:         I'm going to talk about his interview, which I could use whether he calls a witness or not.  I'm not going to get into what – it does or does not check out.  But in his interview he said, I've got an alibi.  They say, great, who is it?  He says, I'm not going to tell you.  So that's fair game.

Defense:       It's not fair game, Your Honor.  The case law is explicit. I didn't think that we were going to have this issue.  The case law is explicit that the State cannot – and the reason the case law is explicit is because there has been a multitude of cases reversed on appeal where the State puts up a straw man of an alibi defense, and then if it's not engaged, it's almost like shifting of the burden, commenting on his right to remain silent during the trial. So, no, it's not appropriate.

(T 229-31.)  The trial court sustained defense counsel's objection at this point.  (T 231.)  However, after opening statements, the court heard further argument from the

parties:

Defense:    I'm relying on case law, is the State may not comment on the defendant's failure to produce witnesses to corroborate an alibi defense when the defendant presents no alibi. Only when a defendant forwards the alibi defense may the State properly comment on defendant's failure to produce an alibi witness…

*** 

            When a prosecutor refers to a defendant's failure to call certain witness or comment on an alibi defense that hasn't been forward – put forward by the Defense, then it violates the right to remain silent.  It's also inconsistent with the presumption of innocence and the State's burden of proof to prove guilt beyond a reasonable doubt.

(T 649.)   The court then allowed the state's proposed testimony and argument concerning Mr. Wilson's lack of alibi.  (T 652.)

During state witness Detective Parsons's testimony, the prosecutor played Mr. Wilson's police interrogation, including the following dialogue to the jury, which occurred after the Detective could be heard repeatedly asking Mr. Wilson where he was at the time of the offense:

Det:        Where were you December 23rd of last year?

Wilson:     With friends.

Q:          Where at?

A:          Out by my grandmama's.

Q:          Out by your grandma's?

A:          Uh-huh.  I don't know the exact address.

Q:     Who was your friends?

A:     I ain't giving up no names.

Q:     **And if you weren't involved, they are your only hope; do you understand?**

A:     This is what I know is that I'm going to jail anyway.

Q:     Tonight.

A:     **Yes, I know that.  I know that.  All of this is going to be cleared out.**

Q:     **How can you be so confident?**

A:     **Because I wasn't there.  I wasn't there**.

Q:     **Present to me – present to me – show me how you weren't there and then I can learn this.  If you could show me and convince me you weren't there, I'll –**

A:     **How can I show you I wasn't there?**

Q:     Who were you with?

A:     Friends.

Q:     Somebody you don't want to identify.  So we're going to go to court and I am going to testify about how we talked –

A:     She'll be there.

Q:     Okay.

A:     She'll be there.

Q:     But you won't disclose her now?

A:     (Unintelligible.)

> **Q:    But she's not going to be credible by that point if you keep**
> **withholding her.  You're withholding your alibi.**
>                                   ***
>
> **Q:    Then the jury will say, why did he say this stuff?  Would he**
> **tell the cops  that?**

(TT 842-854) (emphasis added).    At the conclusion of the taped interrogation,

counsel for co-defendant Kitt requested a curative instruction, arguing that the

interrogation improperly shifted the burden of proof to the defendant.  (T 854.)  Mr.

Wilson's attorney adopted that request, stating, "This was part of the reason that I

objected to that video of the defendant coming in because there is burden shifting in

inherent once that was shown." (T 854.)  The trial court denied the request for a

curative. (T 855.)

Mr. Wilson's attorney objected again to admission of Wilson's taped

statement and the state's comments on Mr. Wilson's lack of alibi during the charge

conference:

> Court:      All right.  Ms. Cashwell, let's talk about the issues that you
>             chewed over and over again.
>
> Counsel:    Okay.  Well, I had argued that the – the defendant's [taped]
>             statement should not have come in because in that
>             statement he says, well, I was at a girl's house over by my
>             grandmother's house, and I'm not going to tell you where
>             that was.  And that – by having that statement admitted, it
>             doesn't show guilt or innocence.  All it did was, in the eyes
>             of the jury, shift the burden.  I think if the State gets up in
>             closing arguments – and remember, we have not put forth
>             one shred of evidence or argued in opening statement or at
>             any time that he had an alibi…

> So if the State gets up and argues and alibi, he has, at that point, shifted the burden.

(T 1304.)  Based on the foregoing, the prosecution's use of evidence and argument that shifted the burden of proof to Mr. Wilson to prove that he was not at Mr. Hackworth's with his co-defendants so infected the trial with unfairness that a due process violation resulted.

## II.    Exhaustion.

Mr. Wilson exhausted his state remedies on this issue – as just explained, his attorney filed a motion in limine to exclude any state comments on a lack of alibi and counsel objected on the state's improper burden shifting and commentary on Wilson's right to silence concerning lack of alibi numerous times throughout the trial. (T 230, 648-49, 651, 652, 854, 1102, 1301, 1304.)   As characterized by the trial court, counsel "chewed [on this issue] over and over again."  (T 1304.)

Mr. Wilson also raised the issue as ground I of his direct appeal, arguing:

> The State elicited testimony and thereafter commented on the Appellant's failure to produce evidence to refute an element of the crime, which erroneously lead [sic] the Jury to believe that the Appellant carried the burden of introducing evidence, which implicated Appellant's privilege against compelled self-incrimination.

(IB, direct appeal 9.)

> The State's reference to the Appellant's failure to call alibi witness(es) was prejudicial, because it referred to the Appellant's exercise of his right to remain silent, and the comments indicated that the Appellant had the burden to come forward with evidence and prove his innocence.

(IB, direct appeal 10-11.)

**III.   The State court decision was based on an unreasonable determination of the facts; and is an unreasonable application of and contrary to *Sandstrom v. Montana*, 442 U.S. 510 (1979), *Mullaney v. Wilbur*, 421 U.S. 684 (1975), and *Doyle* v. *Ohio*, 426 U.S. 610 (1976).**

**A.  Law Applicable to this Case.**

To establish a claim based on prosecutorial misconduct, a two-pronged test

must be met:

> (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991). "The reversal of a conviction or a sentence is warranted when improper comments by a prosecutor have 'so infected the trial with unfairness as to make the resulting conviction [or sentence] a denial of due process.'" Parker v. Head, 244 F.3d 831, 838 (11th Cir. 2001) (quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986)).
>
> * * *
>
> The remarks are considered under the totality of the circumstances. Hall v. Wainwright, 733 F.2d 766, 773 (11th Cir. 1984). To determine whether arguments are sufficiently egregious to result in the denial of due process, we consider factors including: "(1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors." Land, 573 F.3d at 1219-20. "[T]he bar for granting habeas based on prosecutorial misconduct is a high one." Id. at 1220.

Russ v. Dep't of Corr., 476 F. App'x 706, 709 (11th Cir. 2012).

The United States Supreme Court has held that a defendant does not have to

disprove anything nor prove innocence, and "state-created presumptions to the

contrary violate due process." United States v. Simon, 964 F.2d 1082, 1086 (11th

Cir. 1992)(citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d

39 (1979); Mullaney v. Wilbur, 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508

(1975)).  The Eleventh Circuit in Simon explained:

> [The Eleventh Circuit], in recognizing the government's burden and
> obligation of proving guilt beyond a reasonable doubt, has recognized
> that a prosecutor's comment may be so prejudicial as to shift the burden
> of proof. *See Duncan v. Stynchcombe*, 704 F.2d 1213, 1216 (11th Cir.
> 1983). Such prosecutorial misconduct, if "so pronounced and persistent
> that it permeates the entire atmosphere of the trial," requires
> reversal. *United States v. Alanis*, 611 F.2d 123, 126 (5th Cir.), *cert.
> denied*, 445 U.S. 955, 100 S. Ct. 1607, 63 L. Ed. 2d 791
> (1980)(quoting *United States v. Blevins*, 555 F.2d 1236 (5th Cir.
> 1977), *cert. denied*, 434 U.S. 1016, 98 S. Ct. 733, 54 L. Ed. 2d 761
> (1978))…[P]rosecutors must refrain from making burden-shifting
> arguments which suggest that the defendant has an obligation to
> produce any evidence or to prove innocence. *See Winship*, 397 U.S. at
> 364, 90 S. Ct. at 1072. . . . "[T]he limits of proper argument find their
> source in notions of fairness, the same source from which flows the
> right to due process of law." *Houston*, 569 F.2d at 380.

Id.

> Further, as held by the United States Supreme Court in Doyle:

> it does not comport with due process to permit the prosecution during the trial
> to call attention to [a defendant's] silence at the time of arrest and to insist that
> because he did not speak about the facts of the case at that time, as he was told
> he need not do, an unfavorable inference might be drawn…

Doyle v. Ohio, 426 U.S. 610, 619, 96 S. Ct. 2240, 2245 (1976)(citing J. White's

concurring opinion in United States v. Hale, 422 U.S. 171, 182, 95 S. Ct. 2133, 2139

(1975)).

**B. Discussion of the Error.**

The First DCA per curiam affirmed this issue on direct appeal, so this Court "looks through" that decision to the state trial court's reasoning.  <u>Wilson v. Sellers</u>, 138 S. Ct. 1188, 1192 (2018).

The trial court's only stated reason for denying Mr. Wilson's objections to the state's burden shifting evidence and argument concerning Mr. Wilson's lack of alibi was that it "understood" the state's argument:

> State:    Judge, the case that I've pulled is the Florida Supreme Court case of Jackson v. State, 575 So. 2d 181.  Essentially what Ms. Cashwell is arguing that if Mr. Wilson had provided an interview and said, yeah, I did it, it was self-defense, but then at trial wanted to come in and say, it wasn't me, that I couldn't put on that evidence that he said it was self-defense.  That doesn't make any sense.
>
> She told me to bring in case law.  I've done this plenty of time.  This is kind of Prosecution 101.  If they say one thing in their interview and you can prove it's a lie, it's a material fact, then you get to do it.

> Court:    "I understand your argument.  I am going to allow it in."

(T 652-53.)  Each of defense counsel's remaining burden shifting objections were overruled without explanation, or based on the court's prior ruling.

The state's position, which was apparently adopted by the trial court in rejecting Mr. Wilson's burden shifting argument – that under "prosecution 101" the state gets to present Mr. Wilson's statements which were disproven – is a gross oversimplification of the problem here.  This was not simply a matter of the jury

getting to hear that Mr. Wilson said something during his interrogation that the state later disproved. Instead, due to the court's allowance of Mr. Wilson's taped statement on this matter and refusal to give a curative instruction, the jury heard a law enforcement officer repeatedly tell Mr. Wilson that *he had to provide an alibi to establish his innocence*, that the interview was his one opportunity to prove his innocence, *otherwise the jury would not believe him at trial*.   The error was exacerbated by the prosecutor's closing argument where he repeatedly commented on Mr. Wilson's lack of alibi and failure to bring any witness at trial to establish that alibi.  (T 1370, 1440-41.)

The detective's comments during the interrogation and the state's argument that Mr. Wilson failed to establish an alibi is a classic burden-shifting argument and comment on silence.  These comments served to "maximize" the evidentiary value of Mr. Wilson's statement that he was near his grandmother's house at the time of the crimes and shifted "the onus to [Wilson] to prove his innocence." Jackson v. State, 107 So. 3d 328, 343 (Fla. 2012) ("The jury was likely inclined to attach particular significance to the detectives' many statements of Jackson's guilt and ignore Jackson's denials, concentrating solely on his failure to explain the DNA evidence during his custodial interrogation. This could have had the effect of maximizing the evidentiary value of the DNA evidence and improperly shifting the onus to Jackson to prove his innocence."); see also United States v. Jenkins, No. 98-

6026, 1999 U.S. App. LEXIS 21850, at *2-3 (6th Cir. Aug. 11, 1999) (unpublished opinion) ("In *Griffin v. California,* 380 U.S. 609, 615, 14 L. Ed. 2d 106, 85 S. Ct. 1229 (1965), the Supreme Court held that a prosecutor's commenting upon a criminal defendant's failure to testify violates the defendant's Fifth Amendment right not to be a witness against himself. **This principle extends to comments about the defendant's failure to produce evidence**.") (emphasis added); see also Morgan v. State, 700 So. 2d 29, 30 (Fla. 2d DCA 1997) (where no alibi defense is asserted by the defense at trial, any comment on a defendant's failure to produce alibi witnesses is error); Lane v. State, 459 So. 2d 1145 (Fla. 3d DCA 1984)("Because the whole issue of alibi was raised by the state, we find the prosecutor's 'straw man' argument . . . may have led the jury to believe that appellant had the burden of proving his innocence."); Rodriguez v. State, 875 So. 2d 748, 750 (Fla. 2d DCA 2004) ("Except in narrow circumstances not present here, the State may not comment on a defendant's failure to call a witness. *Janiga v. State*, 713 So. 2d 1102 (Fla. 2d DCA 1998) (reversing for new trial because State commented on defendant's failure to call witness to confirm defendant's testimony). Such a comment improperly shifts the burden of proof from the State to the defendant."); D'Annunzio v. State, 683 So. 2d 151, 153 (Fla. 5th DCA 1996).

The situation here is comparable to the facts of Morgan v. State, 700 So. 2d 29 (Fla. 2d DCA 1997). There, the Second DCA reversed for a new trial, where the

defendant took the stand and claimed mistaken identity as a defense, the prosecutor

asked the defendant on cross-examination where he was at the time of the crime, the

defendant said he was at a party, and the prosecutor later argued that the defendant

failed to produce any witnesses to establish he was at that party.  Id. at 30.  The court

held:

> The prosecutor's creation of a "straw man" alibi was clear error. *Williams v. State*, 619 So. 2d 1044 (Fla. 4th DCA 1993); *Lane v. State*, 459 So. 2d 1145 (Fla. 3d DCA 1984)("Because the whole issue of alibi was raised by the state, we find the prosecutor's 'straw man' argument . . . may have led the jury to believe that appellant had the burden of proving his innocence.").  If a defendant asserts an alibi defense, the state may properly comment on the absence of competent witnesses for the defense to corroborate the alibi.  *Hayes v. State*, 660 So. 2d 257 (Fla. 1995); *Jackson v. State*, 575 So. 2d 181 (Fla. 1991); *Brown v. State*, 524 So. 2d 730 (Fla. 4th DCA 1988). **However, when no such defense is asserted, any comment on a defendant's failure to produce alibi witnesses is error**.  *Brown*, 524 So. 2d at 731.

Id. (emphasis supplied)   Here, similar to Morgan, law enforcement repeatedly

questioned Mr. Wilson about where he was at the time of the crimes and told him if

he did not produce an alibi, the jury would not believe him.  When Mr. Wilson

eventually told law enforcement he was near his grandmother's, and the state

repeatedly faulted Mr. Wilson for failing to produce evidence of this alibi at trial.

As repeatedly pointed out by defense counsel in pre-trial and trial, as well as in the

direct appeal, it was error for the prosecution to put the onus on Mr. Wilson to prove

his innocence where he elected not to produce any alibi evidence at trial.

Here, under the totality of the circumstances of the trial, including the weak

and uncorroborated evidence of guilt discussed throughout these proceedings – which relied entirely on Mr. Nelson's testimony that has now been recanted, and Watkins' eyewitness identification that was questionable from the onset – the prosecutor's tactics of requiring Mr. Wilson to prove his innocence so infected the trial with unfairness that Mr. Wilson's Fourteenth Amendment right to due process and a full and fair trial were violated. The state court's determination otherwise, was an unreasonable determination of the facts and contrary to and an unreasonable application of clearly established federal law. A new trial is warranted under these facts and applicable law.

## **Ground III**

**Mr. Wilson received ineffective assistance of trial counsel guaranteed under the Sixth and Fourteenth Amendments where counsel failed to move to sever his trial from co-defendant Deontrez Kitt's trial.**

**I.    Exhaustion.**

Mr. Wilson has exhausted his state remedies on this matter as it was raised in his 3.850 motion(s), he received an evidentiary hearing on the issue, and appealed the denial of this issue to the First DCA.

**II.    The state court decision was based on an unreasonable determination of the facts presented below; and is an unreasonable application of and contrary to <u>Strickland v. Washington</u> and its progeny.**

The First DCA per curiam affirmed this issue on direct appeal, so this Court "looks through" that decision to the state trial court rationale. <u>Wilson</u>, 138 S. Ct. t

1192.

## 1. Deficient performance:

The evidence against Mr. Wilson's co-defendant Deontrez Kitt, was irrefutable. It included a de facto confession to Mr. Vaughn, evidence that Kitt and co-defendants Saulsberry and Nelson hatched a plan to rob Hackworth at Kitt's trailer, Kitt's guilty conscious a provided by Kitt's neighbor Mr. Vaughn, cell phone records tracing Mr. Kitt from crime scene to crime scene, and DNA evidence on a glove found at the murder scene.

Despite the gross disparity in evidence between Mr. Kitt compared to the scant evidence in Mr. Wilson's case, and the fact that the above evidence against Mr. Kitt *did not apply* to Mr. Wilson, they were tried together without objection by defense counsel. While "spillover" evidence, by itself, does not require severance of co-defendant's trials, such evidence may reach a level where a defendant's conviction is predicated merely on his association with a more culpable defendant. United States v. Stoecker, 920 F. Supp. 876, 886 (N.D. Ill. 1996). As explained by the Federal Northern District of Illinois:

> [A] 'gross disparity' in the evidence presents a danger that some defendants will suffer 'spillover prejudice' due to the accumulation of evidence against other defendants. When that occurs, a defendant may suffer a transference of guilt merely due to his association with a more culpable defendant." *United States v. Andrews,* 754 F. Supp. 1161, 1177-78 (N.D. Ill. 1990), citing, *United States v. Garner,* 837 F.2d 1404, 1413 (7th Cir. 1987). In instances where the evidentiary disparity is unquestionable the court will not presume that jury instructions will

> adequately cure potential prejudice, and severance is
> appropriate. *Andrews,* 754 F. Supp. at 1178.

Id. Florida courts have made similar findings. See generally Miller v. State, 756 So. 2d 1072 (Fla. 4th DCA 2000)("A motion to sever should be granted when the evidence sought to be admitted applies only to a co-Defendant, but which may improperly influence the jury as to the charge against the other Defendant."); Moore v. State, 870 So. 2d 74, 76 (Fla. 2d DCA 2003)("it appears that the evidence relating to the ten counts in the information charged only against the Johnsons may have improperly influenced the jury as to the charges against Moore. The trial court's order which summarily denied the motion did not direct this court to the portions of the record which would demonstrate that the evidence was presented by the State in such a manner as to avoid jury confusion and, as Moore has alleged, guilt by association.")

Further, Florida law makes clear that severance may be required in situations other than directly adversarial positions between co-defendants, such as Bruton issues.[12] Under the Florida Rules of Criminal Procedure, the trial court should grant a motion for severance before or during trial whenever severance is "appropriate to promote a fair determination of the guilt or innocence of [any] defendant." Fla. R. Crim. Pr. 3.152(b)(1)(A)(B). This is so even if the criteria for consolidation is

---

[12] Bruton v. United States, 391 U.S. 123 (1968).

otherwise satisfied. Fla. R. Crim. P. 3.151(a); <u>Jefferies v. State</u>, 776 So. 335, 336 (Fla. 1st DCA 2001).  Given the gross disparity in evidence presented by the state as between Mr. Wilson and co-defendant Mr. Kitt, including a de facto confession from Mr. Kitt, a motion to sever would have been granted here had defense counsel filed one.

The postconviction court reasoned that trial counsel Cashwell's failure to sever Wilson's case from Kitt's was strategic based on Cashwell's testimony that she did not believe the court would grant the motion, as well as her interpretation of the law at the time of trial. (PCR 1899.) For the following reasons, this was in error.

First, failing to file a motion that has merit based on a belief the court will deny it is not reasonable trial strategy.  <u>See</u> <u>Sims v. State</u>, 967 So. 2d 148, 153 (Fla. 2007) (finding counsel ineffective in failing to file motion to suppress canine alert evidence despite counsel's belief that the trial judge would have denied such a motion).

Second, a "'tactical or strategic decision'" based on a misunderstanding of the law is unreasonable.  <u>See</u> <u>Sochor v. State</u>, 883 So. 2d 766, 800 (Fla. 2004) (citing <u>Horton v. Zant</u>, 941 F. 2d 1449 (11th Cir. 1991)). In the present case,  counsel's caselaw analysis concerning severance omitted any discussion of existing law holding that "a motion to sever should be granted when the evidence sought to be admitted applies only to a co-defendant, but which may improperly influence the

jury as to the charge against the other defendant." See Miller v. State, 756 So. 2d 1072 (Fla. 4th DCA 2000); Cherry v. State, 835 So. 2d 1205 (Fla. 4th DCA 2003) (finding that the defendant sufficiently pleaded a claim of ineffective assistance of counsel for failing to file a motion to sever, citing Miller, supra.). Counsel did not consider that severance should be granted outside the parameters of a Bruton violation. See Fla. R. Crim. Pro. 3.152(b)(1)(A)(B), Jefferies v. State, 776 So. 2d 335, 336 (Fla. 1st DCA 2001).

Further, trial counsel's postconviction testimony and argument at trial refute her belief that she had no grounds to seek severance.  Defense counsel's closing argument concerning "guilt by association" demonstrates her fear that the jury would convict Mr. Wilson based on the evidence that applied solely against Kitt.   (PCR 1743-44; TT 1374-75, 1378-79.)

During Mr. Wilson's 3.850 postconviction hearing, defense counsel even agreed that Mr. Vaughn's testimony would not have been introduced in a trial solely against Mr. Wilson.  (PCR 1745.)  Accordingly, the lower court's determination that trial counsel was not deficient unreasonably ignores the facts established at trial and in postconviction, as well as the relevant available law that counsel was unaware of that  supporting a severance.

### 2. Prejudice.

Had counsel filed a motion to sever Mr. Wilson's case from Mr. Kitt's, it

would have been granted.[13] As provided above, the prosecutor conceded at Mr. Wilson's evidentiary hearing that there was less evidence against Mr. Wilson than any other co-defendant. (PCR 226.) The evidence against Mr. Kitt, however, was extensive, including a tacit confession to Mr. Vaughn; consciousness of guilt testimony from Mr. Vaughn; testimony from Vaughn that Kitt tried to borrow Vaughn's van to "hit a lick" the day before the incident; testimony that Kitt gave Vaughn dark stained clothes the day after the crimes; Kitt's statement to Vaughn that a witness saw his face; Kitt matched a major DNA profile on a glove found at the shooting location; and cell phone evidence tracked Kitt from crime scene to crime scene along with Nelson and Saulsberry. **None of this evidence existed against Mr. Wilson.**

Critically, the majority of the devastating Kitt evidence would have been inadmissible against Wilson individually because there was no evidence Mr. Wilson was a party to any conspiracy prior to Mr. Nelson showing up at Wilson's girlfriend's house across from Mr. Hackworth's, or the day after the robbery was over.  See Bruton v. United States, 391 U.S. 123, 128 n.3, 88 S. Ct. 1620, 1623 (1968) (a hearsay confession is only admissible against the declarant); Burnside v. State, 656 So. 2d 241, 245 (Fla. 5th DCA 1995) ("When Barrett spoke to Campbell

---

[13] See generally Kimmelman v. Morrison, 477 U.S. 365, 375 (1986) (defendant must demonstrate the motion would have been granted to establish prejudice).

after the murders, any conspiracy had ended; the statement was not the admission of

a co-conspirator during the course and in furtherance of the conspiracy."); <u>Moore v.

State</u>, 503 So. 2d 923, 924 (Fla. 5th DCA 1987) ("Nevertheless, there was no proof

-- independent or otherwise -- that Moore was a party to a conspiracy to

traffic at the time of the previously recorded conversations (*i.e.*, those prior to

November 29) between Laney and Stansell.")(emphasis added).

The Fourth DCA in <u>Miller v. State</u>, 756 So. 2d 1072 (Fla. 4th DCA 2000)

found, in the direct appeal posture, that the trial court abused its discretion in failing

to file a motion to sever under similar circumstances:

> Two brothers were tried together for committing aggravated battery upon a single victim. Both claimed that they acted in self-defense after the victim became aggressive and had threatened to kill the appellant. At trial, the state sought to have the victim testify as to a telephone call from appellant's brother in which he apologized to the victim for the incident and offered him money in exchange for dropping the charges. Arguing that the state was trying to prove consciousness of guilt from appellant's brother's statement which would be imputed to appellant, defense counsel moved to sever appellant's trial …

> [] Florida Rule of Criminal Procedure 3.152(b)(1)(B) provides that the court shall order a severance of defendants if requested during trial "on a showing that the order is necessary to achieve a fair determination of the guilt or innocence of 1 or more defendants." A motion to sever should be granted when the evidence sought to be admitted applies only to a co-defendant, but which may improperly influence the jury as to the charge against the other defendant. *See Viniegra v. State*, 604 So. 2d 863, 864 (Fla. 3d DCA 1992). … [I]n the instant case, the acknowledgment of guilt by appellant's brother…undermined both defendants' theory of self-defense. We conclude that the court abused its discretion in denying the motion to sever. We therefore reverse and remand for a new trial.

_Id._ In Mr. Wilson's case, similar to <u>Miller</u>, Vaughn's testimony served to improperly influence the jury as to Mr. Wilson's guilt and create a significant risk that the jury would convict Mr. Wilson based on evidence relevant only to Kitt. *See Cason v. State*, 211 So. 2d 604, 605 (Fla. 2nd DCA 1968)("If there had been evidence directly against a co-Defendant which was prejudicial against Cason, this argument [the motion for severance should have been granted] would be sound.").

The trial record also demonstrates the fundamental unfairness of the consolidated trial. The State did not inform the jury that Mr. Vaughn's testimony solely applied to Mr. Kitt, or that the jury needed to evaluate Nelson and Watkins' credibility separately for each co-defendant. Nor was a cautionary instruction given about distinguishing the evidence. <u>See</u> <u>McCray v. State</u>, 416 So. 2d 804, 806 (Fla. 1982) ("a court may: 'in its discretion, [] grant severance when the jury could be confused or improperly influenced by evidence which applies to only one of several defendants.'). Also, Mr. Wilson was unable to cross-examine Mr. Kitt regarding his alleged interactions with Mr. Vaughn, creating a confrontation clause issue. <u>See</u> <u>Miller v. State</u>, 545 So. 2d 343, 344 (Fla. 2d DCA 1989).

The prosecutor candidly admitted that he "had the most facts against Deontrez Kitt." (PCR 1650.) The state's theory of guilt as to Kitt and Wilson was so interwoven that that it would have been difficult for the jury to parcel out the evidence as between the two co-defendants to arrive at fair and impartial verdicts.

See Moore v. State, 870 So. 2d 74, 76 (Fla. 2d DCA 2003)("it appears that the evidence relating to the ten counts in the information charged only against the Johnsons may have improperly influenced the jury as to the charges against Moore. The trial court's order which summarily denied the motion did not direct this court to the portions of the record which would demonstrate that the evidence was presented by the State in such a manner as to avoid jury confusion and, as Moore has alleged, guilt by association.")  It would be naïve to believe the prejudicial effect of this evidence would have been removed from the minds of the jurors simply because it was directed to one co-defendant and not the other. McCray v. State, 416 So. 2d 804, 806 (Fla. 1982)("The rule allows the trial court, in its discretion, to grant severance when the jury could be confused or improperly influenced by evidence which applies to only one of several defendants. A type of evidence that can cause confusion is the confession of a defendant which, by implication, affects a codefendant, but which the jury is supposed to consider only as to the confessing defendant and not as to the others.")

The postconviction court's incorrect analysis of the cell phone evidence in Ground I – mistakenly finding that Wilson's cell phone records show he traveled from the burglary location, to the shooting location, to the boat ramp – demonstrates

the confusing nature of the consolidated trial.[14]  (PCR 1895.)  In other words, *even the  postconviction court was unable to correctly identify which evidence applied to Wilson versus Kitt*.

Because Mr. Wilson and Deontrez Kitt were tried together – two co-defendants who were literally pointing their fingers at one another in trial due to the glove with both men's DNA on it[15] – the state was allowed to capitalize on the strength of its case against Kitt to overcome the weaknesses in the case against Wilson. Given the tremendously prejudicial nature of the state's case against Mr. Kitt, there is a reasonable probability that the jury, as discussed in defense counsel's closing argument, found Mr. Wilson "guilty by association" and that Mr. Wilson would have been convicted in a standalone trial.

Accordingly, the state court based its decision on an unreasonable determination of the facts in light of the evidence before it and was contrary to and unreasonably applied the governing federal law as defined by the United States

---

[14] Mr. Wilson's cell phone evidence only placed him in the vicinity of Mr. Hackworth's apartment, which was right across the street from his girlfriend's house.  The records did not show that he travelled from the area of Hackworth's apartment, to the vicinity of J Street (the murder location), to the boat ramp, like the other co-defendants' cell phone records did.

[15] "No latent prints, and the State says, well, that glove – that glove, I agree, could have only been worn by one person and that person was Deontrez Kitt.  Well, then where's the glove from Mr. Wilson?" (TT 1392 – Anthony Wilson closing argument)

Supreme Court.  This court should grant the instant petition and reverse for a new trial.

### **Ground IV**

**Mr. Wilson received ineffective assistance of trial counsel guaranteed under the Sixth and Fourteenth Amendments where counsel failed to investigate and present exculpatory and impeachment witness, Stacey Gulley, at trial.**

### I.   Exhaustion.

This issue was exhausted in state court.  Mr. Wilson raised a claim of ineffective assistance of counsel for failure to investigate and present Stacey Gulley at trial in his 3.850 motion(s), during his postconviction evidentiary hearing, and on 3.850 appeal.

### II.   Deficient Performance.

#### A.  Relevant facts

Monica Watkins, Mr. Hackworth's fiancé and eyewitness to the robbery/kidnapping, was a key witness against Mr. Wilson because she identified Wilson in a photo lineup - albeit several months after the actual incident.  Despite Watkin's importance to the state's case against Mr. Wilson, defense counsel did not investigate or present a known potential witness, Stacey Gulley, who would have provided significant exculpatory and impeachment evidence against Watkins challenging her alleged photo identification of Mr. Wilson.

Stacey Gulley testified in postconviction that she was willing and available to testify in Petitioner Wilson's trial. (PCR 1575-76.) Ms. Gulley testified that she had been friends with Monica Watkins for about ten years. Immediately after the offense occurred, Ms. Gulley went to Mr. Hackworth's grandmother's house and saw a "whole bunch of people" there, including Ms. Watkins. (PCR 1566-70.) Ms. Gulley played "detective" by asking Ms. Watkins over several conversations a series of questions about possible suspects, but Watkins could not provide any information about the suspects. (PCR 1569-70.) Ms. Watkins was also under pressure to make an identification, because members of Mr. Hackworth's family began accusing *her* of being involved in this crime:

> People were saying that that wasn't his baby [Watkins was pregnant at the time of the crimes]; and whoever the guy that supposedly got her pregnant, it was him, and then they accused the wife [Rachel Hackworth]. As a matter of fact, the insurance settlement was held up because they accused her, and they thought her and his best friend had something to do with it. I think they kind of accused a lot of people.

(PCR 1571.) Ms. Gulley drove Ms. Watkins to the State Attorney's Office on one occasion and observed her interview with the prosecutor. Someone at the prosecutor's office showed Ms. Watkins a picture of "somebody I didn't recognize," a "photo of a ski mask," and "a circumference area of…Mr. Kitt's cell phone in the area that it's saying he would have been it." (PCR 1572-73.)

Prior to Ms. Watkins being shown either photo lineup with Mr. Kitt or Mr. Wilson's pictures, Watkins texted Gulley a picture of someone she believed was a

suspect in this case, but Ms. Gulley did not recognize the person. Ms. Gulley then sent a picture of Mr. Kitt to Watkins, and Ms. Watkins said "No; that ain't him." (PCR 1574.)

Despite that it would have benefitted Mr. Wilson to present evidence that Ms. Watkins' photo lineups were tainted, and that defense counsel had heard of Ms. Gulley at the time of trial (see e.g. TT 348-49, 801) (PCR 1623), Defense counsel admitted in postconviction that she did not have any recollection of taking Ms. Gulley's deposition or meeting with her. Counsel admitted the "first time" she met Ms. Gulley was during these postconviction proceedings. (PCR 1761-62.)

## B.  Deficient Performance.

Despite counsel's admissions that she never spoke with Ms. Gulley, and that Ms. Gulley testified in postconviction that Ms. Watkins a) could not identify the assailants; and b) was shown photos of potential suspects including Mr. Kitt, who she denied was involved prior to her photo lineups, the postconviction court did not find counsel deficient in failing to investigate or presenting Gulley as a witness. Instead, the court opined Ms. Gulley was not "trustworthy" and that she was not "forthcoming or cooperative."   The court also opined Gulley would have not attended the trial, despite her testimony that she would. (PCR 1903.)   The trial court's determination represents and unreasonable determination of the facts for the following reasons:

First, it is defense counsel's duty to investigate witnesses or make a reasonable decision not to investigate further – it is not a witness' responsibility to come forward and involve themselves in a case. Ms. Cashwell's failure to present Ms. Gulley at trial cannot be strategic, as insinuated by the lower court, because counsel could not recall even speaking to Ms. Gulley and did not know what Gulley could offer to Mr. Wilson's case.  Thus, she could not make a reasonably informed decision whether Ms. Gulley would be helpful.  See Wiggins v. Smith, 539 U.S. 510, 527-28 (2003)(without a reasonable investigation, a fully-informed decision with respect to trial strategy is "impossible.")

 Second, the court's opinion that Ms. Gulley would not have shown up for trial is not supported competent substantial evidence.  If Mr. Kitt was like another son to Ms. Gulley, as found by the lower court (PCR 1903), the court's additional finding that Gulley would not have shown up at trial on Mr. Kitt or Wilson's behalf is contradictory. Further, the court's reliance on defense counsel Cashwell's testimony to find that Ms. Gulley would not have participated at trial forgets that Ms. Cashwell *did not even speak to Ms. Gulley*, so Cashwell was unaware whether Ms. Gulley would have cooperated.  (PCR 1761-62, 1903); see Yarbrough v. State, 871 So. 2d 1026, 1030 (Fla. 1st DCA 2004) (reversing trial court's order that denied claim of ineffective assistance of counsel where "the trial court's order did not focus on trial counsel's failure to make reasonable efforts to investigate Ms. Reeves as a

potential witness")

Third, the lower court's finding that Gulley's postconviction testimony should be afforded "little weight" omits that her testimony was *corroborated by Ms. Watkins' own postconviction testimony* confirming that she and Gulley *did exchange* a photo of Kitt prior to her photo identifications in this case. (PCR 1903.)

Accordingly, the lower court's deficient performance analysis amounts to an improper post hoc rationalization and an unreasonable determination of the facts, and is contrary to or an unreasonable application of <u>Strickland</u>. <u>See</u> <u>id</u>, at 526-27 ("When viewed in this light, the 'strategic decision' the state courts and respondents all invoke to justify counsel's [deficient act] resembles more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing."); <u>see also</u> <u>Harrington v. Richter</u>, 131 S. Ct. 770, 790 (2011); <u>State v. Williams</u>, 797 So. 2d 1235, 1239 (Fla. 2001).

For the reasons stated herein, counsel's failure to present a witness who would have refuted one of the two most important pieces of evidence –the photo id – against Mr. Wilson in this weak case, amounted to deficient performance.

## III.   Prejudice.

Although Ms. Gulley's testimony refuted Ms. Watkins' trial testimony that she could identify Mr. Kitt and Mr. Wilson as perpetrators in this incident, the jury never heard it when assessing Watkins' credibility at trial. This evidence was

critically important as Ms. Watkins' was the only witness that could allegedly identify Mr. Wilson as one of the perpetrators in this case. Ms. Gulley's testimony would have also provided exculpatory evidence that Watkins' photo identifications were tainted, as Watkins had already seen a photo of Kitt and determined that he was not involved, and had been presented a photo of someone with dreadlocks immediately after Hackworth was taken from their apartment. Gulley's testimony would have eliminated the State's repeated arguments at trial that were was "no explanation" for Watkins' photo identification of Wilson other than his guilt. (T 1357, 1435).

Accordingly, for the reasons set forth herein, there is a reasonable probability that the outcome of the proceedings would have been different, and the state court's determination to the contrary represents an unreasonable determination of the facts and is contrary to/and an unreasonable application of Strickland. See Yarbrough, 871 So. 2d 1026 (counsel's failure to interview and present witness undermined confidence in the outcome of the trial).

## CONCLUSION

Mr. Wilson's case must be remanded to state court with instructions that a new trial is granted for the aforementioned reasons.

Respectfully submitted,

THE SICHTA FIRM, LLC.

**/s/ Susanne Sichta**
SUSANNE K. SICHTA, ESQ.
Fla. Bar No. 59108
RICK A. SICHTA, ESQ.
Fla. Bar No. 669903
301 W. Bay St. Suite 14124
Jacksonville, FL 32202
904-329-7246
susanne@sichtalaw.com
Attorneys for Petitioner

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy hereof has been furnished to the Office of the Attorney General, Tallahassee through the cm/ecf system and by email to crimapptlh@myfloridalegal.com this 18th day of October, 2021.

**/s/ Susanne Sichta**
ATTORNEY

* Mr. Wilson's oath is attached on the following page.

## <u>OATH</u>

I swear under penalty of perjury that the content of the foregoing petition is true and correct.

ANTHONY WILSON

Provided to Graceville Correctional Facility on _AW_ for mailing, by
9/27/21