UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ANTHONY LAMAR WILSON, JR,

      Petitioner,

v.                                                    Case No. 3:21cv988-MCR-HTC

RICKY D. DIXON,

      Respondent.

_____/

## REPORT AND RECOMMENDATION

Petitioner, Anthony Lamar Wilson, Jr., through counsel, filed an amended petition under 28 U.S.C. § 2254, challenging his conviction for first degree felony murder and armed burglary. ECF Doc. 7. After considering the petition, the record, the state's response, Doc. 17, and Petitioner's reply, ECF Doc. 21, the undersigned recommends the petition be DENIED without an evidentiary hearing.

## I.  BACKGROUND

Petitioner was convicted of participating in the home invasion robbery, kidnapping, and murder of Terrance Hackworth in the early morning hours of December 24, 2012. The following is taken from the testimony presented at Petitioner's trial.[1]

---

[1] As will be discussed below, Petitioner was tried along with a co-defendant, Deontrez Kitt.

Hackworth lived with his fiancée, Monica Watkins, and four children at an apartment on J Street in Pensacola, Florida. His brother, Dale Snow, testified that shortly before 2:50 a.m. he dropped Hackworth off at the J Street apartment after going to a concert with him. ECF Doc. 17-26 at 75. Snow also testified he told police he saw a black two-door Monte Carlo with a red stripe parked near the apartment that he found suspicious. *Id.* at 76-77.

Watkins testified she was asleep when Hackworth got home but was awakened in the middle of the night by an armed man whom she did not recognize ordering her to go into the living room. *Id.* at 120-21. He was carrying a gun with an extended clip and wearing a mask "like a hood – everything was covered but his eyes and his mouth." *Id.* at 130. When she got to the living room, she saw Hackworth on the floor, being held at gun point and interrogated by a man with gold teeth, light skin, and low haircut, who was not wearing a mask and had a revolver. *Id.* at 124-25. There were other men who were ransacking the apartment for drugs and money. *Id.* at 122 & 135-36. She interacted mainly with three individuals: the man who awakened her; the individual with the gold teeth whom she considered the ringleader, *id.* at 126; and a third man who did not wear a mask and who was dark-skinned, had dreadlocks, and his hair pulled back in a ponytail. *Id.* at 123-24.

The ringleader continued to beat and interrogate Hackworth, at one point hitting him with the gun, causing him to bleed profusely. He then held the gun to Watkins' head, asking Hackworth where his money and drugs were and threatening

to shoot Watkins if Hackworth did not tell them.  *Id.* at 127-28.  He told Hackworth and Watkins he had done his homework on Hackworth and was sure he had money and drugs.  *Id.* at 129.  Hackworth and Watkins, however, continued to insist there were no drugs and money, and Watkins testified the perpetrators eventually came to believe Hackworth did not have money or drugs on the premises.  *Id.* at 138.  The three men, thus, began discussing kidnapping Hackworth for ransom.  *Id.*

The men discussed which of the victims' vehicles to take and decided on Watkins' white Buick because the trunk of Hackworth's vehicle was filled with speakers, leading Watkins to believe they planned to put Hackworth in the trunk.  *Id.* at 139.  They warned Watkins not to contact the police, bound Hackworth with duct tape, put a grey sweatshirt over his head and carried him out the back door.  *Id.* at 137.  The three men were in the home for about an hour.  *Id.* at 144.  After Hackworth was taken out the door, Watkins gathered her children and went to a neighbor's house to call her mother, the victim's mother, and 911.  *Id.* at 142.

Meanwhile, police received a report of shots fired in the area of S Street and Blount – a few miles Northwest of the J Street apartment – and a patrol lieutenant made contact with three teenagers who had made the 911 call.  ECF Doc. 17-27 at 71.  One of the teens noticed a white Buick after it crashed into a chain link fence at that intersection.  *Id.* at 90-91.  When he looked over, he saw a black man, who was tied up and wearing boxer shorts, jump out of the vehicle and attempt to run away.  *Id.* at 93.  The Buick reversed course as if trying to run the man over.  The Buick

missed and stalled. *Id.* Then, the driver of the vehicle, who had dreadlocks,[2] got out and "somebody started shooting"[3] at the man attempting to run away. *Id.* The teen ran away once the shooting started and did not see anything further. *Id.*

Police searched the area but did not find Hackworth or anything of evidentiary value other than a mark indicating a car had accelerated away from the area. ECF Doc. 17-27 at 72, 85. A couple of hours later, another officer returned to the scene and found a glove on the corner of the road near the intersection of S Street and Blount. *Id.* at 114. It looked like it had not been there long and had a discoloration on it which was later identified as blood. *Id.*

Later that morning, police received a call about a submerged vehicle at the Sanders Beach Boat Ramp, a few miles south of S Street and Blount, which turned out to be the white Buick. *Id.* at 139 & 189. Nobody was inside the vehicle. *Id.* at 147-49. Inside the trunk—which had completely filled with water—police found a gray hooded sweatshirt like the one placed over the victim's head and a single piece of duct tape. Also, when setting up the police crime scene tape, one officer came across a black ski mask, *id.* at 140, and, several hours later, Hackworth's sister found

---

[2] The witness initially testified he could not recall what type of hair the driver had, but, after being shown his prior testimony in the Deavis Saulsberry trial, he testified the driver had "dreads." ECF Doc. 17-27 at 94-95. On cross-examination, defense counsel elicited that the witness had previously stated the driver of the white Buick had a low haircut. *Id.* at 99-100.
[3] At trial, the witness initially stated he did not know where the shooter was sitting in the car, but after being shown his prior testimony stated the shooter came from the driver's seat. ECF Doc. 17-27 at 94.

a suspicious blue glove and white sock in a wooded area just over a gate next to the parking lot, which police retrieved. *Id.* at 153-54.

Two days later, police received an anonymous tip that a body was found in a vacant lot near the intersection of S Street and Blount. ECF Doc. 17-28 at 10 & 122. Police identified the body as Hackworth, and the coroner determined he was killed on December 23rd or 24th, consistent with the Watkins' statement. ECF Doc. 17-29 at 178-79. A crime scene analyst for the Pensacola Police Department testified he found four spent 9mm shell casings and a piece of duct tape just east of the body. *Id.* at 11-12. At trial, a FDLE firearms expert testified the casings all came from the same "SWD" brand firearm, *id.* at 50, which is a hand-held, semiautomatic machine gun that looks similar to an "Uzi." *Id.* at 54.

On January 2, 2013, police prepared a photographic line-up containing Trevon Nelson[4] and presented it to Watkins. ECF Doc. 17-28 at 138-39. She identified Nelson as the man who woke her up and ordered her into the living room. ECF Doc. 17-24 at 157-58. On January 31, 2013, police matched Nelson's DNA to DNA found on the black ski mask found at the boat ramp.[5] ECF Doc. 17-42 at 287. On February 12, 2013, Nelson was arrested and initially interviewed the same day at police headquarters. ECF Doc. 17-28 at 140. Lead Investigator Parsons testified at trial

---

[4] It was never explained at trial why Nelson became a suspect.
[5] A DNA analyst testified that only one in five million people would match the profile on the black ski mask that matched Trevon Nelson. ECF Doc. 17-30 at 16.

that Nelson was initially uncooperative and denied involvement in the murder.  *Id.*
at 125-26.

On April 2, 2013, however, Nelson was interviewed again, confessed his
involvement (though minimizing it, as explained below), and named Deontrez Kitt,
Deavis Saulsberry, and Petitioner Wilson as also being involved.  ECF Doc. 17-42
at 287.  Three days later, police showed Watkins a photographic lineup containing a
photo of Kitt, and she identified him as the ringleader.  ECF Doc. 17-24 at 160-61.
Then, they showed her a photographic lineup of individuals with dreadlocks, and
she identified Wilson as the man with the dreadlocks[6] in her apartment that night.
*Id.* at 162-64.  She was also shown a photographic line up containing a picture of
Saulsberry but did not identify anyone from that line up.  *Id.* at 171-73.  She
explained at trial that this was because Saulsberry wore a mask during the incident.

A series of interviews and a deposition of Nelson followed, in which he
consistently named Kitt, Wilson, and Saulsberry as the other three involved, but in
which he changed certain details about the crime and his admission as to the level of
his own involvement.

---

[6] Before they knew of Wilson as a suspect, Police had previously shown Watkins two lineups
containing individuals with dreadlocks other than Wilson, and Watkins indicated she was unable
to select any photo as being the person in her home with dreadlocks that night.  ECF Doc. 17-24
at 165-70; 17-26 at 147-48.

On January 31, 2013, DNA tests connected Saulsberry's and Hackworth's DNA to the blue glove at the boat ramp. ECF Doc. 17-42 at 287. Saulsberry was arrested in February 2013, followed by Kitt in June 2013. ECF Doc. 17-42 at 244.

Wilson was arrested in July of 2013, *id.*, and his initial interview with police was played for the jury. ECF Doc. 17-29 at 72. Wilson denied involvement, and when police told him they had phone records showing he communicated with the others the day of the crime, he claimed, "You can't say that" and "I don't talk to them boys like that." *Id.* at 76. When asked where he was that night, he first claimed to be "with friends . . . out by my grandma's" and then promised an alibi witness would testify for him, stating "she'll be there" at trial. *Id.* at 86.

Nelson's testimony at trial regarding the crime is summarized as follows. He had known the other three defendants for ten to fifteen years each. ECF Doc. 17-28 at 162-63. While Kitt, Nelson, and Saulsberry were at Kitt's trailer the afternoon of December 23, 2012, they discussed robbing Hackworth of cocaine and money. *Id.* at 164. Wilson was not at the trailer. *Id.* The three left, drove to the area of Hackworth's apartment, and Nelson was dropped off at a female's apartment in Sanchez Court, which was directly behind Hackworth's complex. *Id.* at 166-68. Wilson came over to the apartment, and Nelson called Kitt and Saulsberry who also came over. *Id.* at 170-71. The conversation about robbing Hackworth came up again, and they went over to his apartment to "confront him." *Id.* at 171.

As Hackworth returned home, they forced him in the back door, with Kitt carrying a revolver, Wilson carrying an inoperable .380, and Saulsberry and Nelson having a Mac-11 machine gun with an extended clip at various times during the incident. ECF Doc. 17-28 at 173. Nelson wore a mask that covered most of face, Kitt and Wilson did not wear masks and Saulsberry wore something over his face. *Id.* at 173-74. Saulsberry had a sock and a blue glove on his hands, and everyone else had gloves on. *Id.* at 174. The three men ransacked the house, looking for drugs and money but found very little. *Id.* at 176-78.

Eventually, the conversation changed to taking Hackworth for ransom. *Id.* at 179. Hackworth was bound with duct tape, and Nelson left to bring the black Monte Carlo he said belonged to Kitt over from Sanchez Court. *Id.* at 180. Kitt got in the passenger seat of the Monte Carlo as Nelson drove, and Wilson drove Watkins' white Buick, with Saulsberry in the passenger seat and Hackworth in the trunk. *Id.* at 181. A few moments later, at S Street and Blount, Nelson saw the Buick's trunk pop open and Hackworth jump out. *Id.* Nelson saw the Buick back up, Wilson and Saulsberry get out of the car, and then Saulsberry shoot at and chase Hackworth. *Id.* at 182. After several shots out of Nelson's view, Saulsberry ran up to the Monte Carlo and told Nelson to meet them at Sanders Beach. *Id.* at 182-83. At Sanders Beach, Nelson opened the door to let them in, in the process dropping his ski mask, and drove back to Kitt's trailer. *Id.* at 184.

On cross-examination, Nelson admitted he had given various versions of the events since his arrest, but on redirect acknowledged he never varied on his description of who was involved with him.  ECF Doc. 17-29 at 70-71.

In addition to the testimonies above, the State also presented testimony from Kitt's neighbor, whose cell phone Kitt used the night of the crimes; a phone records expert who testified about the numerous calls made among the men around the time of the crimes and the location of the phones while in use, which refuted Petitioner's claim he was at his grandmother's house; and a DNA expert who testified about the men's and Hackworth's DNA being found on various items recovered from or around the crime scenes.

The jury convicted Wilson of First-Degree Felony Murder and Burglary with a Firearm but found he did not actually possess a firearm during the crime.  ECF Doc. 17-19 at 17.  The court sentenced Wilson to mandatory life in prison.  *Id.* at 21. He appealed the judgment to the First District Court of Appeals ("First DCA"), which affirmed *per curiam* without written opinion on October 14, 2016.  *Wilson v. State*, 202 So. 3d 414 (Fla. Dist. Ct. App. 2016); Case No. 1D14-5422.   The conviction became final, and the one-year time limit under the Antiterrorism and Effective Death Penalty Act Of 1996 ("AEDPA") began running, ninety days later, on January 12, 2017.

On January 12, 2018, the deadline for Wilson to file a federal habeas petition, Wilson filed a motion under 3.850, ECF Doc. 17-38 at 36, which was continuously

pending until August 27, 2021, when the First DCA issued its mandate, affirming *per* curiam, without written opinion. *See* Case No.: 1D20-2352), and a *per curiam* affirmance without a written opinion by the First DCA. ECF Doc. 17-47. Wilson filed the instant federal petition on the same day; thus, the petition is timely filed.

## II.   LEGAL STANDARDS

The AEDPA governs a state prisoner's petition for habeas corpus relief. 28 U.S.C. § 2254. Under the AEDPA, relief may only be granted on a claim adjudicated on the merits in state court if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). This standard is both mandatory and difficult to meet. *White v. Woodall*, 572 U.S. 415, 419 (2014).

"Clearly established federal law" consists of the governing legal principles set forth in the decisions of the United States Supreme Court when the state court issued its decision. *Id.* A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005); *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Bottoson*, 234 F.3d at 531 (quoting *Williams*, 529 U.S. at 406). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). When it comes to factual determinations, "[s]tate court fact-findings are entitled to a presumption of correctness unless the petitioner rebuts that presumption by clear and convincing evidence." *Conner v. GDCP Warden*, 784 F.3d 752, 761 (11th Cir. 2015); 28 U.S.C. § 2254(e)(1).

In Grounds Three and Four Petitioner seeks relief on a claim of ineffective assistance of trial counsel ("IATC"). To succeed on an IATC claim, Petitioner must show that (1) counsel's performance during representation fell below an objective standard of reasonableness, and (2) prejudice resulted, *i.e.*, that a reasonable probability exists that but for counsel's unprofessional conduct, the result of the

proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 689 (1984).

The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential. *Id.* at 689. The defendant bears the burden of proving that counsel's performance was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. *Id.* at 688-89

*Strickland*'s prejudice prong requires a petitioner to allege more than simply that counsel's conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. The petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Bare allegations the petitioner was prejudiced by counsel's performance are not enough. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).

## III. DISCUSSION

### A.   Ground One: State Court Denial of New Trial

In Ground One of the petition, Wilson argues the state court's decision not to give him a new trial despite Nelson recanting his trial testimony, and, in particular,

his implication of Wilson as being involved in the crime, violated his due process rights.[7]  As discussed below, Wilson is not entitled to relief on this ground.

Despite implicating Wilson and others in the Hackworth's kidnapping and murder at trial, Nelson recanted that testimony in a May 12, 2016, letter, ECF Doc. 17-38 at 169, and in a typed affidavit dated October 16, 2018.  ECF Doc. 17-41 at 155.  In the May 12 letter, Nelson stated he "lied on under oath repeatedly," because State Attorney Jeff Gaddy threatened Nelson "with charging [his] mother with witness tampering if [he] didn't do as he said."  He stated that he "and the codefendants in my case are innocent of any charges."  ECF Doc. 17-38 at 169.

In the October 16, 2018, typed affidavit, Nelson admitted he was involved with the murder, but that he had lied about Wilson's involvement.  In the affidavit, he claimed Wilson was innocent.  ECF Doc. 17-41 at 154.  Although Nelson and the others met Wilson at a woman's house before the crimes and asked him to join the robbery, Wilson declined to do so.  *Id.*  Nelson claimed he lied at trial for several reasons, including the threatened prosecution of his mother, and threats of harm to him and his family made by Hackworth's associates in jail.  *Id.*  He named Wilson as a participant because law enforcement told Nelson they believed someone with

---

[7] In Ground One, Petitioner also argues that the postconviction judge improperly discounted the testimony of Stacey Gulley.  This argument is without merit for the reasons discussed below, in Ground Four.

dreadlocks was involved and Wilson was the first person he could think of that matched that description. *Id.*

In a 3.850 motion, Wilson argued Nelson's affidavit was new evidence that warranted a new trial.[8]  The state court held an evidentiary hearing on the claim, hearing testimony from Nelson and State Attorney Gaddy.  ECF Doc. 17-42 at 29. At the hearing, Nelson claimed that on the day he was arrested for this crime, he was taken to the Pensacola Police Department for an interrogation and the officers showed him his mother crying but then closed the door and began the questioning. Nelson then gave them a lengthy list of those involved.  *Id.* at 41-42.  Nelson also testified Wilson was rapping in his studio at the home of the mother of one of his children when Nelson asked him to commit the robbery and Wilson declined to take part in it.  ECF Doc. 17-42 at 44-45.  Reading from his affidavit, Nelson repeated the claims of duress about his mother and being jumped in jail and about his mental illness and medications.  *Id.* at 52.  He admitted he did not learn the information he gave police from getting discovery early in the case but contended the investigator and State Attorney Jeff Gaddy were feeding him information.  *Id.* at 52-53.

---

[8] The Secretary argues Wilson did not exhaust this claim because he couched it solely in terms of a state law violation.  *See Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007) (per curiam) (quotation omitted) ("To exhaust state remedies fully[,] the petitioner must make the state court aware that the claims asserted present federal constitutional issues.").  The Court disagrees.  Although Wilson did not specifically reference a federal constitutional violation in the 3.850 motion or the initial brief on appeal, he did rely on federal case law to argue a new trial should be granted because Nelson's recantation undermines the jury's verdict.  That, in essence, is a due process argument.

Nelson's testimony, however, is refuted by the transcript of his initial police interview where he denied involvement and did not give any names of people involved. ECF Doc. 17-39 at 299. Also, in the beginning of that interview, Nelson asked if he could call his "mama" and the officers asked for her name and number. Nelson told them her name and gave them her phone number and address without mentioning that she had just been in the doorway. *Id.* at 301-02. He would not have needed to call his mom if she was in another room.

On cross-examination, the State pointed out that Nelson's story changed over the course of his various police interviews, deposition, trial testimony in the Saulsberry trial, testimony in the Kitt / Wilson trial, handwritten recantation, and typed affidavit recantation. ECF Doc. 17-42 at 81-102. Nelson admitted that none of the allegedly coercive statements by law enforcement were found on any of the transcripts of his interviews but claimed they did not always turn the recorder on when they spoke to him. *Id.* at 105. The State also elicited that the charges against Nelson's mother were dismissed in April of 2014 and Nelson did not give his deposition or testify in the Saulsberry trial until months later – July of 2014 for the deposition and Saulsberry trial, and November of 2014 for the trial of Kitt and Wilson. *Id.* at 109-10. Nelson also refused to answer questions about whether Kitt and Saulsberry were involved, and the court held him in contempt for refusing to answer. *Id.* at 121-22. Notably, at no time did Nelson identify who the fourth individual, with dreads, was, if it was not Wilson.

Mr. Gaddy testified at the evidentiary hearing that he never threatened to prosecute Nelson's mother, Elease Robbins, and that the case was initiated and handled by other officers.  ECF Doc. 210-11.  While Mr. Gaddy was aware of threats against Nelson by the victim's friends and family, Mr. Gaddy took precautions to move Nelson to another facility to ensure his safety.  *Id.* at 219.  Mr. Gaddy testified he never told or even suggested to Nelson what he should say, contrary to Nelson's assertions.  *Id.* at 211-19.  Further, Mr. Gaddy testified that Nelson was under no obligation to testify as part of his plea agreement.  ECF Doc. 17-42 at 208-09; 229.

Having heard the testimonies, the state court judge denied relief, finding Gaddy's testimony to be credible and Nelson's to be not credible.  Specifically, the court stated it "accepts Mr. Gaddy's testimony as true and rejects Nelson's".  ECF Doc. 17-43 at 143-47.

Wilson argues Nelson's post-trial declarations show Wilson is actually innocent of the charges against him.  However, as Wilson admitted in the Amended Petition, "the Eleventh Circuit has consistently found that freestanding claims of newly discovered evidence demonstrating actual innocence are not cognizable in non-capital federal habeas corpus petitions."  ECF Doc. 7 at 29-30 (citing *Mize v Hall*, 532 F. 3d 1184, 1198 (11th Cir. 2008) and *In re Davis*, 565 F.3d 810, 824 (11th Cir. 2009)).  Wilson argues, "[h]owever, the Circuit Court consistently addresses such claims on the merits in the alternative."  Therefore, despite this precedent,

Wilson explains he is raising the instant claim "for preservation purposes." ECF
Doc. 7 at 29-30.

Wilson is not entitled to relief on Ground One. "Claims of actual innocence
based on newly discovered evidence have never been held to state a ground for
federal habeas relief absent an independent constitutional violation occurring in the
underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400
(1993). "Newly discovered evidence which goes only to the guilt or innocence of
the petitioner is not sufficient to require habeas relief." *Swindle v. Davis*, 846 F.2d
706, 707 (11th Cir. 1988) (citing *Smith v. Wainwright*, 741 F.2d 1248 (11th Cir.
1984), *cert. denied*, 470 U.S. 1087 (1985)).

Federal courts do not carry the role "to make an independent determination of
petitioner's guilt or innocence based on evidence that has emerged since trial,"
because the federal court's role in habeas claims is "to ensure that individuals are
not imprisoned in violation of the Constitution – not to correct errors of fact."
*Brownless v. Haley*, 306 F.3d 1043, 1065 (11th Cir. 2002). Thus, the mere
recantation of testimony is not a ground for habeas relief. *Miller v. Gordy*, 2019 WL
2511201, at *16 (N.D. Ala. May 6, 2019), *report and recommendation adopted*,
2019 WL 2502020 (N.D. Ala. June 17, 2019) (citing *Brownless*, *supra*).

Wilson argues in the reply that the state court erred in not granting a new trial.
The undersigned disagrees. First, a federal court on habeas review must defer to
credibility determinations made by the state court and, here, the state court simply

found no credence in Nelson's testimony.  *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) (per curiam) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)), *cert. denied*, 568 U.S. 849 (2012) ("Federal habeas courts have 'no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'").  When it comes to factual determinations, "[s]tate court fact-findings are entitled to a presumption of correctness unless the petitioner rebuts that presumption by clear and convincing evidence." *Conner v. GDCP Warden*, 784 F.3d 752, 761 (11th Cir. 2015); 28 U.S.C. § 2254(e)(1).  Second, given that Nelson's version of events depends on the shifting sands of what he believes is most beneficial to him at the time, his recantations are a far cry from being sufficient to produce an acquittal.

In sum, the state court's conclusion that Nelson's recantation was false and did not warrant a new trial was not unreasonable.  The Eleventh Circuit has repeatedly explained that "recantations are viewed with extreme suspicion by the courts," *In re Davis*, 565 F.3d 810, 825 (11th Cir. 2009) (quoting *United States v. Santiago*, 837 F.2d 1545, 1550 (11th Cir. 1988)), and it would not be unreasonable for a jury to be similarly suspicious of them. *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1154 (11th Cir. 2022), *cert. denied sub nom. Green v. Dixon*, 143 S. Ct. 982 (2023).

**B.    Ground Two: Prosecutorial Comment of Petitioner not Having an Alibi Violated Petitioner's Right to Silence and Due Process Rights under the Fifth and Fourteenth Amendments**

In Ground Two, Wilson argues the admission of his interview with law enforcement violated his due process rights and right against self-incrimination, because it suggested to the jury that he should have testified about his alibi or provided an alibi witness.  ECF Doc. 7 at 54; ECF Doc. 17-29 at 85-87.  Wilson is not entitled to habeas relief because the state court's denial of relief was not contrary to, and did not involve an unreasonable application of, clearly established Federal law.[9]  28 U.S.C. § 2254(d).

"A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was manifestly intended to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to

---

[9] As with Ground One, the Secretary argues Wilson failed to raise this as a federal claim to the state courts and also failed to preserve the issue.  The undersigned disagrees.  While Wilson did not expressly refer to the Fifth or Fourteenth Amendment, his arguments on appeal in state court were replete with references to his right to remain silent which arises exclusively under the Fifth Amendment.  *See Pearson v. Sec'y, Dep't of Corr.*, 273 F. App'x 847, 849-50 (11th Cir. 2008) ("The exhaustion doctrine requires the petitioner to 'fairly present' his federal claims to the state courts in a manner to alert them that the ruling under review violated a federal constitutional right.").  Also, Wilson properly preserved this issue with a continuing objection to the admission of the interview and the prosecutor's comments.  ECF Doc. 17-25 at 46, 48; ECF Doc. 17-28 at 78; *Floyd v. State*, 850 So. 2d 383, 393 (Fla. 2002) ("We reject the State's contention that this issue is not preserved for review.  Floyd clearly had a continuing objection before the trial judge which we determine was sufficient to preserve the issue.")

testify." *United States v. Knowles*, 66 F.3d 1146, 1162–63 (11th Cir. 1995) (marks and citations omitted). Neither prong of the *Knowles* test is present here.

Here, as the prosecutor explained to the trial court, he sought to admit Wilson's interview to show Wilson lied about his whereabouts, not as a comment on Wilson's failure to testify. The prosecutor did not comment on Wilson not producing evidence supporting his alibi; he merely pointed out that the initial statement volunteered by Wilson to law enforcement was contradicted by cell phone records. *See Williams v. Wainwright*, 673 F.2d 1182, 1185 (11th Cir. 1982) (holding that a jury would not necessarily have taken a prosecutor's statement as a comment on the defendant's silence because the prosecutor did not directly mention the defendant's failure to testify).

This was not a case where the defendant was silent about his whereabouts and the state pointed that out to the jury; instead, here the defendant made a statement about his whereabouts and the prosecution argued this statement was false and showed consciousness of guilt. *See, e.g.*, *Walker v. State*, 495 So. 2d 1240, 1241 (Fla. 5th DCA 1986) ("The state was entitled to present evidence that the defendant had lied about his whereabouts at the time of the crimes in question because such false exculpatory statements are admissible in the state's case as substantive evidence tending to affirmatively show a consciousness of guilt on the part of the defendant.") (citing 2 Wigmore, Evidence § 278 (Chadbourne Rev. 1979) and 1 Wharton's Criminal Evidence § 218 (13th Ed.1972)). For example, Wilson's

statement that he was near his grandmother's house when the crime was committed (Ex. B27. pp. 846-47) was refuted by his cell phone records (Ex. B26. pp. 697-98; Ex. B27. pp. 880-83) and thus was admissible to show his consciousness of guilt and efforts to avoid prosecution. *Griffin v. Sec'y, Dep't of Corr.*, 2016 WL 5146611, at *16 (M.D. Fla. Sept. 21, 2016) ("In Florida, '[e]vidence of a defendant's acts or statements calculated to defeat or avoid his prosecution is admissible against him as showing consciousness of guilt.'") (quoting *Brown v. State*, 391 So.2d 729, 730 (Fla. 3d DCA 1980)). Thus. the state court was not unreasonable in finding that the jury would not necessarily take the comments and evidence to be a comment on the defendant's failure to prove an alibi at trial.

Wilson argues in the Reply the state's admission of Wilson's interview was prejudicial and, thus, deprived him of due process. When a federal court reviews a state court's evidentiary decision, it cannot grant relief unless it finds that the evidence was not just prejudicial, but that the prejudice "greatly outweighed" its relevance that its admission rises to a constitutional violation. *See United States v. Cannon*, 525 F.2d 414, 420 (7th Cir. 1975). The undersigned does not find that standard has been met here. The interview was relevant to show that Wilson lied about where he was the night Hackworth was killed. Any potential prejudice that the jury considered the evidence as anything else, simply does not outweigh—much less "greatly outweigh"—its relevance. Wilson is not entitled to habeas relief on Ground Two.

**C.**    **Ground Three: IATC for Failing to Move to Sever His Trial from Co-Defendant Deontrez Kitt's Trial**

In Ground Three, Wilson argues trial counsel was ineffective for failing to move to sever Wilson's trial from that of his codefendant, Deontrez Kitt. Wilson claims that because the evidence against Kitt was irrefutable as to him, by trying the two men together, Wilson's "conviction [was] predicated merely on his association with a more culpable defendant." ECF Doc. 7 at 67. The state court applied *Strickland* and concluded that Wilson could not meet either the deficient performance or prejudice prong. As explained below, this conclusion was not contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d).

The state court's conclusion that counsel's performance was not deficient for not moving to sever (Ex. C1. pp. 1898-99) is supported by the record and counsel's testimony at the evidentiary hearing on Wilson's motion for postconviction relief. As the state court noted, counsel contemplated filing a motion to sever prior to trial, but ultimately determined she lacked sufficient grounds to do so after researching the issue. ECF Doc. 17-43 at 148 (citing Tr. of December 30, 2013, hearing; ECF Doc. 17-43 at 301-02).

As defense counsel explained, a severance was not supported by *Coleman v. State*, 610 So. 2d 1283, 1285 (Fla. 1992), a case in which the court held that

severance is unnecessary "when all the relevant evidence regarding the criminal offense is presented in such a manner that the jury can distinguish the evidence relating to each defendant's acts, conduct, and statements, and can then apply the law intelligently and without confusion to determine the individual defendant's guilt or innocence"); *Johnson v. State*, 720 So. 2d 232 (Fla. 1998), a case in which the court determined severance not necessary where co-defendants "did not blame one another for the crimes or confess to the crimes" and defendant's conviction was not dependent upon the use of antagonistic evidence by his co-defendant); or *Hunter v. State*, 8 So. 3d 1052 (Fla. 2008), a case in which the court stated that "the fact that the defendant might have a better chance of acquittal or a strategic advantage if tried separately does not establish the right to a severance." Based on her research, counsel did not feel she could "in good faith move for a severance." ECF Doc. 17-42 at 339.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" especially when counsel has considered and rejected alternative courses of action. *Strickland*, 466 U.S. at 690–91; *see also Henry v. State*, 948 So. 2d 609, 617 (Fla. 2006). Thus, given the results of counsel's research, her strategic decision to forego moving to sever was not patently unreasonable. *See Dingle v. Sec'y for Dept. of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) ("Even if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was

'so patently unreasonable that no competent attorney would have chosen it.'") (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir.1983)). The trial court, therefore, did not err in determining Petitioner had not satisfied the *Strickland*'s performance prong.

The trial court also did not err in concluding that Wilson failed to establish *Strickland's* prejudice prong. The court found that neither Wilson nor Kitt testified at the trial and their defenses were not adverse. Also, the jury was able to distinguish the relative roles Wilson and Kitt had in the crime because, while the jury found both defendants guilty of burglary, it only found Kitt possessed a firearm during the commission of the crime. *See United States v. Walker*, 720 F.2d 1527, 1534 (11th Cir. 1983) ("[I]f the verdict itself suggests that the jury carefully sorted the evidence, as when it acquits on certain counts, a conviction will be upheld."). Also, any potential prejudice was mitigated by the trial court's instruction to the jury that they must consider only the evidence applicable to each defendant and that a finding of guilty or not guilty as to one does not affect the verdict as to the other. ECF Doc. 17-32 at 145 (emphasis supplied); *United States v. Walker*, 720 F.2d 1527, 1534 (11th Cir. 1983) ("[T]he admitted possibilities of confusion inherent in a multicount and multidefendant prosecution can be significantly alleviated if the trial judge is careful to instruct the jury that it must consider the evidence against each defendant on a separate and independent basis.").

Thus, Wilson has failed to establish a substantial likelihood that the outcome of his trial would have been different had counsel moved to sever. *Harrington*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable."). Wilson is not entitled to relief in Ground Three.

### D.    Ground Four: IATC for Failing to Investigate and Call at Trial Exculpatory and Impeachment Witness Stacey Gulley

Wilson argues counsel was ineffective for failing to investigate and present witness Stacey Gulley at trial, a witness who would have called into question Watkins' photo identifications of Kitt and Wilson. ECF Doc. 7 at 77-78. After hearing testimony from Gulley and defense counsel at the evidentiary hearing, the state court found that counsel had not performed deficiently and that Wilson had not shown he was prejudiced by Gulley not testifying. The state court's determination is neither contrary to law nor a misapplication of the facts.

First, Gulley testified she had *not* made "defense counsel aware she possessed any relevant information" prior to trial; "did not get involved because her sons strongly warned her against it"; and "the first time she spoke with anyone was a couple years" before the evidentiary hearing. ECF Doc. 17-43 at 152. Thus, Wilson failed to show defense counsel had any reason to further investigate Gulley as a witness, particularly when counsel testified that she considered Gulley to not be "forthcoming", "cooperative", or "trustworthy." *Id.* at 153.

Second, as the state court determined, even if Gulley had testified, her testimony would have been easily discredited because she was biased in favor of Kitt. Similarly, Gulley's testimony about her interrogation of Watkins about potential suspects would not have changed the outcome of the trial. According to Gulley, when she "asked [Watkins] every question you could possibly ask a person" about whether Watkins could identify the suspects, Watkins became annoyed and told her, "I don't know why it is you keep asking me that same thing over again when I told you I don't know." ECF Doc. 17-42 at 168-70. Wilson interprets this testimony to mean that "Ms. Watkins could not independently recall *anything* about the suspects." However, this is flatly contradicted by Watkins' statements to the police and trial testimony where she described the incident in detail and was able to describe the three individuals with whom she interacted the most. *See* ECF Doc. 17-43 at 153.

Wilson also argues the court should have given greater weight to the fact that Gulley testified at the evidentiary hearing that Watkins had looked at a picture Gulley sent of Kitt and said it was not him. ECF Doc. 17-42 at 173-74. This testimony is not believable because it contradicted Watkins' testimony that *she* sent Gulley a picture of Kitt after being shown such a picture by Hackworth's ex-wife, and not the other way around. ECF Doc. 17-42 at 180-81. Given this contradiction between Gulley's and Watkins' testimonies, Gulley's testimony would not have turned the tide in favor of a not guilty verdict. Therefore, the state court's conclusion

that Petitioner was not prejudiced by Gulley not testifying was not unreasonable. Petitioner is not entitled to habeas relief on Ground Four.

## IV.    CONCLUSION

### A.    Evidentiary Hearing

The undersigned finds that an evidentiary hearing is not warranted. In deciding whether to grant an evidentiary hearing, this Court must consider "whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Additionally, this Court must take into account the deferential standards prescribed by § 2254. *See id.* Upon consideration, the undersigned finds that the claims in this case can be resolved without an evidentiary hearing. *See Schriro*, 550 U.S. at 574.

### B.    Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Court provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

After review of the record, the Court finds no substantial showing of the denial of a constitutional right.  § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, it is also recommended that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "[B]efore entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Rule 11(a), Rules Governing 2254 Cases.  If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this Report and Recommendation.

Accordingly, it is respectfully RECOMMENDED:

1.    That the amended petition under 28 U.S.C. § 2254, challenging the conviction in *State v. Wilson*, 2013 CF 758, in the First Judicial District, in and for Escambia County, Florida, ECF Doc. 7, be DENIED without an evidentiary hearing.

2.    That a certificate of appealability be DENIED.

3.    That the clerk be directed to close the file.

At Pensacola, Florida, this 13th day of July, 2023.

/s/ Hope Thai Cannon
**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed **within fourteen (14) days** of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.